YOUNG, J.
Article 3, § 8 of the Michigan Constitution allows the Governor or either house of the Legislature to request the opinion of this Court “on important questions of law upon solemn occasions as to the constitutionality of legislation .. ..” We granted the House of Representatives’ request to opine on the constitutionality of 2005 PA 71, MCL 168.523. Of concern to the House is the constitutionality of the requirement that voters either present photo identification or sign an affidavit averring that the voter lacks photo identification before voting.
We hold that the photo identification requirement contained in the statute is facially constitutional under the balancing test articulated by the United States Supreme Court in Burdick v Takushi.[1] The identification requirement is a reasonable, nondiscriminatory restriction designed to preserve the purity of elections and to prevent abuses of the electoral franchise, as demanded by art 2, § 4 of the Michigan Constitution, thereby preventing lawful voters from having their votes diluted by those cast by fraudulent voters. Moreover, as no voter is required to incur the costs of obtaining a photo identification card as a condition of voting, the identification obligation imposed by MCL 168.523(1) cannot properly be characterized as an un *8 constitutional poll tax under the Twenty-fourth Amendment of the United States Constitution.
I. UNDERLYING BACKGROUND FACTS
In 1996, our Legislature amended the Michigan Election Law, MCL 168.1 et seq., to include § 523, which required a voter to present photo identification before voting. The 1996 amendment was nearly identical to the statutory provision at issue in this case.[2] However, before the amendment became effective, an opinion of the Attorney General issued, concluding that the photo identification requirement in § 523 violated the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution.[3] Specifically, the Attorney General opinion indicated that the photo identification requirement was “not necessary to further a compelling state interest” in the absence of evidence of “substantial voter fraud in Michigan” and that the requirement imposed “economic and logistical burdens” on those without photo identification.[4] Therefore, although the law was passed by both houses and signed by the Governor, the Secretary of State has never complied with or enforced this validly enacted law.[5]
*9 Subsequent events brought renewed interest in election reform. The 2000 presidential election revealed highly publicized alleged deficiencies in the electoral system in several states.[6] In an effort to address these deficiencies, Congress passed the Help America Vote Act (HAVA) in 2002, which imposed minimum administration standards on state elections.[7] HAVA requires that first-time voters who register by mail present proof of identity in the form of photo identification or other alternative documentation.[8] In addition, HAVA specifically indicates that its provisions establish minimum, requirements, explicitly authorizing states to institute consistent “administration requirements that are more strict” than the federal requirements.[9]
After the enactment of HAVA, the Commission on Federal Election Reform was formed to “assess HAVA’s implementation” and to “offer recommendations for further improvement.”[10] The findings and recommendations of the commission were released in September 2005. One recommendation proposed that voters pro *10 vide photo identification in order to deter fraud and enhance ballot integrity.[11] The commission noted that “[t]he electoral system cannot inspire public confidence if no safeguards exist to deter or detect fraud or to confirm the identity of voters. Photo IDs currently are needed to board a plane, enter federal buildings, and cash a check. Voting is equally important.”[12]
MCL 168.523, with its photo identification requirement, was amended by 2005 PA 71. Concerned by the adverse Attorney General opinion regarding the previous enactment of § 523, the Michigan House of Representatives adopted a resolution requesting that this Court issue an advisory opinion regarding whether the photo identification requirements contained in 2005 PA 71 violate either the Michigan Constitution or the United States Constitution.[13] We granted the request, asking the Attorney General to submit briefs and argue as both opponent and proponent of the issue.[14]
II. APPLICABLE STANDARDS AND JURISDICTIONAL ISSUES
The question presented in this original proceeding, whether MCL 168.523 is facially violative of either the *11 Michigan Constitution or the United States Constitution, is purely a question of law. To the degree the provisions are congruous, this Court has previously construed Michigan’s equal protection provision[15] to be coextensive with the Equal Protection Clause of the federal constitution.[16]
A statute challenged on a constitutional basis is “clothed in a presumption of constitutionality,”[17] and the burden of proving that a statute is unconstitutional rests with the party challenging it.[18] A party challenging the facial constitutionality of a statute “faces an extremely rigorous standard,”[19] and must show that “ ‘ “no set of circumstances exists under which the [a]ct would be valid.” ’ ”[20]
*12 As a preliminary matter, the opposing Attorney General claims that this Court lacks the constitutional authority to issue an advisory opinion in this case because the request for the advisory opinion was untimely. Const 1963, art 3, § 8 provides that either house of the Legislature or the Governor may request an advisory opinion regarding the constitutionality of legislation “after [the legislation] has been enacted into law but before its effective date.”
The opposing Attorney General maintains that, because 2005 PA 71 was an amendment of 1996 PA 583, MCL 8.3u dictates that the effective date of 2005 PA 71 was March 31, 1997, the effective date of 1996 PA 583.[21] Essentially, the opposing Attorney General claims that Const 1963, art 3, § 8 cannot be satisfied because the effective date of the public act occurred eight years before 2005 PA 71 existed. This misconstrues MCL 8.3u, which merely requires that once a reenacted, amended, or revised law becomes operational, it is treated as a continuation of the prior law. It is axiomatic that a statute becomes operational only upon its effective date.[22] Moreover, MCL 8.3 indicates that MCL 8.3u is to be observed “unless such construction would be *13 inconsistent with the manifest intent of the legislature.” The manifest intent of the Legislature indicates that the effective date of 2005 PA 71 was January 1, 2007. Because the House of Representatives requested an advisory opinion well before that date, this Court indisputably has jurisdiction under art 3, § 8 to render an advisory opinion in this matter.
III. RELEVANT STATUTORY PROVISIONS
The statute at issue, MCL 168.523, provides in relevant part:
(1) At each election, before being given a ballot, each registered elector offering to vote shall identify himself or herself by presenting an official state identification card ..., an operator’s or chauffeur’s license ..., or other generally recognized picture identification card and by executing an application showing his or her signature or mark and address of residence in the presence of an election official. ... If the elector does not have an official state identification card, operator’s or chauffeur’s license as required in this subsection, or other generally recognized picture identification card, the individual shall sign an affidavit to that effect before an election inspector and be allowed to vote as otherwise provided in this act. However, an elector being allowed to vote without the identification required under this subsection is subject to challenge as provided in section 727.
The statutory provision requires that a registered elector perform two distinct acts before being given a ballot. First, the elector must present photo identification in the form of a driver’s license, state identification card, or “other generally recognized picture identification card.”[23] *14 Second, the elector must execute, in the presence of an election official, an application bearing the elector’s signature and address. The statute specifically provides that in the event that an elector does not have the necessary photo identification, an elector need only “sign an affidavit to that effect” before the elector shall “be allowed to vote.” The statute indicates, however, that an elector voting without identification is “subject to challenge” under the challenge procedures outlined in MCL 168.727.[24]
The opposing Attorney General maintains that voters without photo identification are impermissibly bur *15 dened because the phrase “subject to” indicates that the challenge procedure is not discretionary, but is compulsory whenever a voter seeks to vote without photo identification. However, this claim is not supported by the language of the statute. The plain meaning of the phrase “subject to” connotes possibility, and in this context is appropriately defined as meaning “open or exposed to.”[25] Moreover, another provision of § 523(1), a mere three sentences from the provision at issue, describes a situation in which the application of the challenge procedure is clearly mandatory, as indicated by use of the phrase “shall be challenged.”[26] Here, the Legislature chose to use the particular phrase “subject to challenge” rather than the mandatory phrase “shall be challenged.” The fact that the Legislature used both the mandatory and permissive language concerning challenges of electors within the same statutory provision suggests that there is no basis for concluding that it intended “subject to” to be the equivalent to “shall.” We presume that the Legislature intended the meaning of the words used in the statute, and we may not substitute alternative language for that used by the Legislature.[27] Therefore, we interpret the last sentence of § 523(1) to indicate that an elector voting without photo identification faces the possibility of challenge under § 727, but that the challenge procedure is not compulsory. Rather, utilizing the plain language of *16 § 727, any voter, including those without photo identification, may be challenged, but only if the person challenging the voter “knows or has good reason to suspect” that the voter is not a registered elector of that precinct.[28]
IV CONSTITUTIONAL CHALLENGE
A. NATURE OF THE COMPETING INTERESTS
The “right to vote” is not expressly enumerated in either our state constitution or the federal constitution.[29] Rather, it has been held that the right to vote is an implicit “ ‘fundamental political right’ ” that is “ ‘preservative of all rights.’ ”[30] As the United States Supreme Court noted, “a citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction.”[31] However, “ [t]his ‘equal right to vote’ is not absolute . . . .”[32]
Balanced against a citizen’s “right to vote” are the constitutional commands given by the people of Michigan to the Legislature in Const 1963, art 2, § 4, which states in relevant part:
*17 The legislature shall enact laws to regulate the time, place and manner of all nominations and elections, except as otherwise provided in this constitution or in the constitution and laws of the United States. The legislature shall enact laws to preserve the purity of elections, to preserve the secrecy of the ballot, to guard against abuses of the elective franchise, and to provide for a system of voter registration and absentee voting. [Emphasis added.]
Under art 2, § 4, in addition to the legislative responsibility of regulating the “time, place and manner” of elections, the Legislature has been specifically commanded by the people of Michigan to “preserve the purity of elections” and “to guard against abuses of the elective franchise.” These provisions have been a part of our constitution for almost as long as Michigan has been a state.[33]
As this Court noted in the nineteenth century, the purpose of a law enacted pursuant to these constitutional directives “is not to prevent any qualified elector from voting, or unnecessarily to hinder or impair his privilege. It is for the purpose of preventing fraudulent voting.” [34] Under the Legislature’s authority to “preserve the purity of elections” and “to guard against *18 abuses of the elective franchise,” the Legislature may “regulate, but cannot destroy, the enjoyment of the elective franchise.”[35]
In addition to the specific legislative mandate to prevent fraudulent voting contained in the Michigan Constitution, federal jurisprudence has long recognized that a state has the authority to regulate elections under the federal constitution as well as a “compelling interest in preventing voter fraud.”[36] Article I, § 4 of the federal constitution provides that states may prescribe “[t]he Times, Places and Manner of holding Elections for Senators and Kepresentatives . . . .”[37] In Smiley v Holm,[38] the United States Supreme Court discussed the scope of state authority to regulate federal elections under art 1, § 4:
It cannot be doubted that these comprehensive words embrace authority to provide a complete code for congressional elections, not only as to times and places, but in relation to notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns; in short, to enact the numerous requirements as to procedure and safeguards which experience shows are necessary in order to enforce the fundamental right involved.
Federal jurisprudence has likewise recognized that states retain the power to regulate state and local *19 elections, subject to federal constitutional and statutory limitations.[39]
In addition to possessing the constitutional authority to regulate elections, the United States Supreme Court has also recognized that states have a compelling interest in preserving the integrity of their election processes, including an interest in “ensuring that an individual’s right to vote is not undermined by fraud in the election process.”[40] As the Supreme Court observed in Purcell:[41]
Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy. Voter fraud drives honest citizens out of the democratic process and breeds distrust of our government. Voters who fear their legitimate votes will be outweighed by fraudulent ones will feel disenfranchised. “The right of suffrage can be denied by a debasement or dilution of the weight of a citizen’s vote just as effectively as by wholly prohibiting the free exercise of the franchise.”
Thus, fraudulent voting effectively dilutes the votes of lawful voters. By instituting requirements to guard against abuse of the elective franchise, a state protects the right of lawful voters to exercise their full share of this franchise.
In order to protect that compelling interest, a state may enact “generally applicable and evenhanded re *20 strictions that protect the integrity and reliability of the electoral process,”[42] because
[c]ommon sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections; “as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes.”[43]
In sum, while a citizen’s right to vote is fundamental, this right is not unfettered. It competes with the state’s compelling interest in preserving the integrity of its elections and the Legislature’s constitutional obligation to preserve the purity of elections and to guard against abuses of the elective franchise, including ensuring that lawful voters not have their votes diluted.
B. STANDARD OF SCRUTINY
i. FEDERAL JURISPRUDENCE
Generally, where a law classifies by a suspect category, or “where a law classifies in such a way as to infringe constitutionally protected fundamental rights, heightened scrutiny under the Equal Protection Clause is required.”[44] However, in the context of assessing a challenge to the constitutionality of an election law, the United States Supreme Court has rejected the notion *21 that every election law must be evaluated under strict scrutiny analysis.[45] The Court recognized that “to subject every voting regulation to strict scrutiny and to require that the regulation be narrowly tailored to advance a compelling state interest. . . would tie the hands of States seeking to assure that elections are operated equitably and efficiently.”[46] Rather, the Court has held that a “flexible standard” is applicable:
A court considering a challenge to a state election law must weigh “the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate” against “the precise interests put forward by the State as justifications for the burden imposed by its rule,” taking into consideration “the extent to which those interests make it necessary to burden the plaintiffs rights.”
Under this standard, the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights. Thus, as we have recognized when those rights are subjected to “severe” restrictions, the regulation must be “narrowly drawn to advance a state interest of compelling importance.” But when a state election law provision imposes only “reasonable, nondiscriminatory restrictions” upon the First and Fourteenth Amendment rights of voters, “the State’s important regulatory interests are generally sufficient to justify” the restrictions. [47]
Thus, the first step in determining whether an election law contravenes the constitution is to determine *22 the nature and magnitude of the claimed restriction inflicted by the election law on the right to vote, weighed against the precise interest identified by the state. If the burden on the right to vote is severe, then the regulation must be “narrowly drawn” to further a compelling state interest. However, if the restriction imposed is reasonable and nondiscriminatory, then the law is upheld as warranted by the important regulatory interest identified by the state. The United States Supreme Court has stressed that each inquiry is fact and circumstance specific, because “[n]o bright line separates permissible election-related regulation from unconstitutional infringements . . . ,”[48]
Like every election regulation, MCL 168.523(1) imposes to some degree a burden on an elector.[49] However, the photo identification requirement contained in the statute does not impose a severe burden upon an *23 elector’s right to vote. For the overwhelming majority of registered voters in Michigan, the statute merely requires the presentation of photo identification that the voter already possesses.[50] The opposing Attorney General does not claim that requiring an elector to identify himself imposes a severe burden on the right to vote, nor claims that the act of reaching into one’s purse or wallet and presenting photo identification before being issued a ballot imposes a severe burden on the right to vote.[51]
Rather, the opposing Attorney General maintains that the statute is facially unconstitutional because an impermissibly severe burden falls on those registered voters who, for whatever reason, do not possess the necessary photo identification. According to this argument, those without photo identification, particularly the “poor, racial and ethnic minorities, elderly, and the disabled,” are unable to “gain free and unfettered access to the ballot box.”[52] However, the statute explicitly provides that an elector without photo identification need only sign an affidavit in the presence of an election inspector before being “allowed to vote.” The opposing Attorney General fails to explain why the act of signing an affidavit in lieu of presenting photo *24 identification imposes a severe burden on the right to vote.[53] Surely, affixing a signature to such an affidavit is no greater a burden than affixing a signature to the required election application under MCL 168.523. Moreover, the affidavit alternative to the photo identification requirement imposes less of a burden than is imposed on those voters who are required to execute a sworn statement before casting a provisional ballot.[54] While both voters are required to execute sworn statements, a provisional ballot “is not tabulated on election day”;[55] instead, the ballot is not tabulated until the provisional voter’s eligibility is verified within six days after the election.[56] There is simply no basis to conclude that requiring an elector to sign an affidavit as an alternative to presenting photo identification imposes a severe burden on the right to vote. Furthermore, the application of a “strict standard would be especially inappropriate in a case such as this, in which the right to vote is on both sides of the ledger.”[57] This is so because fraudulent voting dilutes the vote of legitimate voters.[58]
*25 The photo identification provision contained in MCL 168.523 imposes only a “reasonable, nondiscriminatory restriction” on the right to vote that is warranted by the precise interest identified by the state — Michigan’s compelling regulatory interest in preventing voter fraud as well as enforcement of the constitutional directive contained in art 2, § 4 to “preserve the purity of elections” and “to guard against abuses of the elective franchise.” The identification requirement applies evenhandedly to every registered voter in the state of Michigan without making distinctions with regard to any class or characteristic. In every circumstance, a registered voter need only take one of two actions in order to cast an in-person ballot-either present photo identification or sign an affidavit. The affidavit alternative is equally available to a voter who chooses not to obtain identification, a voter whose faith precludes him from obtaining photo identification, a voter who cannot obtain identification, or a voter who simply lost his identification.
Moreover, the statute is a reasonable means to prevent the occurrence of in-person voter fraud. As our Secretary of State has indicated, “without a personal identification requirement it is nearly impossible to detect in-person voter fraud.”[59] In-person voter fraud is, by its very nature, covert.[60] In order to prevent in-person voter fraud, it is reasonable to require the person seeking to cast a ballot to provide reliable identification that he is, in fact, the individual regis *26 tered to vote.[61] The prevention of fraud in the first instance is critical, because it is impossible to remedy the harm inflicted by the fraudulently cast ballot by correcting the vote count, as our constitution requires that ballots remain secret.[62] Conducting the election anew is the only remedy available to purge the taint of a fraudulently cast ballot, a solution described as “imperfect” and having a “negative impact on voter turnout.”[63]
The opposing Attorney General argues that MCL 168.523(1) fails even under a lower standard of scrutiny because in-person voter fraud “is very rare”; thus, the state’s interest in preventing fraud is “illusory” because there is no significant evidence of in-person voter fraud.[64] Moreover, the opposing Attorney General argues that the statute does nothing to address or prevent fraudulent absentee voting, “where fraud is known to exist.” However, there is no requirement that the Legislature “prove” that significant in-person voter fraud exists before it may permissibly act to prevent it. The United States Supreme Court has explicitly stated that “elaborate, empirical verification of the weighti *27 ness of the State’s asserted justifications” is not required,[65] Rather, a state is permitted to take prophylactic action to respond to potential electoral problems:
To require States to prove actual [harm] as a predicate to the imposition of reasonable . . . restrictions would invariably lead to endless court battles over the sufficiency of the “evidence” marshaled by a State to prove the predicate. Such a requirement would necessitate that a State’s political system sustain some level of damage before the legislature could take corrective action. Legislatures, we think, should be permitted to respond to potential deficiencies in the electoral process with foresight rather than reactively, provided that the response is reasonable and does not significantly impinge on constitutionally protected rights.[66]
Therefore, the state is not required to provide any proof, much less “significant proof,” of in-person voter fraud before it may permissibly take steps to prevent it.
Furthermore, the Legislature is not obligated under the Equal Protection Clause to address at once every point at which fraud might occur.[67] Even in the context of voting regulations, the Legislature is “allowed to take reform ‘one step at a time,’ ” and is not required “to cover every evil that might conceivably have been attacked.”[68] Rather, the Legislature is given the discretion to weigh the perceived harm and determine ame *28 liorative priorities without running afoul of equal protection guarantees:[69]
Evils in the same field may be of different dimensions and proportions, requiring different remedies. Or so the legislature may think. Or the reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind. The legislature may select one phase of one field and apply a remedy there, neglecting the others. The prohibition of the Equal Protection Clause goes no further than the invidious discrimination.[70]
Because we conclude that the obligation imposed by the statute of either presenting photo identification or signing an affidavit is not a severe burden on the right to vote, and that the statute imposes only a reasonable, nondiscriminatory restriction on the election process in furtherance of Michigan’s compelling regulatory interest in preventing voter fraud and enforcing art 2, § 4 to “preserve the purity of elections” and “to guard against abuses of the elective franchise” by ensuring that lawful voters not have their votes diluted, we conclude that the statute is facially constitutional under the flexible standard articulated in Burdick, supra.
*29 ii. MICHIGAN CONSTITUTION
The opposing Attorney General argues that the Michigan Constitution grants a higher level of protection and that the “flexible test” articulated in Burdick is not consistent with Const 1963, art 1, § 2. First, the opposing Attorney General notes that, in contrast to its federal counterpart, the Michigan equal protection provision contains an express recognition of “political rights.” Thus, counsel maintains that any regulation affecting “political rights” necessitates strict scrutiny analysis. Second, citing Wilkins v Ann Arbor City Clerk[71] and Michigan State UAW Community Action Program Council v Secretary of State,[72] the opposing Attorney General maintains that the Michigan Constitution requires that every law that applies even a de minimis burden on the right to vote must be analyzed under strict scrutiny.
While Const 1963, art 1, § 2 does contain the term “political rights,” that term does not stand in isolation.[73] We have discovered no authority, and counsel has revealed none, holding that the term “political rights” has ever been interpreted as providing an unfettered right to vote divorced from any type of time, place, or manner restriction. Rather, reading the constitutional provision in context, it provides that no person shall be *30 denied “the enjoyment of his civil or political rights or be discriminated against in the exercise thereof because of religion, race, color or national origin.” (Emphasis added.) However, as the opposing Attorney General acknowledges in its brief, the distinction made in MCL 168.523(1) is between “those who possess photo identification and those who do not.”[74] Nothing in the statute denies an elector the right to vote, and certainly does not do so because of religion, race, color, or national origin. Accordingly, Const 1963, art 1, § 2 provides no support for the claim that strict scrutiny must be applied to every election regulation.
Likewise, the cases cited by the opposing Attorney General do not support the claim that the Michigan Constitution requires that every election law be subject to strict scrutiny review. In Wilkins, supra, this Court considered the constitutionality of MCL 168.11(b), a statute that precluded students from establishing residency for the purposes of voter registration. Previous caselaw construing the statute held that a student could register to vote by overcoming a rebuttable presumption that the student was not a resident in the locale of the institution of learning.[75] Relying exclusively on federal authority, Wilkins held that the statute violated both federal and state due process and equal protection provisions. The Court held that the statute violated due process because there were no consistently applied standards by which a student could overcome the presumption of nonresidency.
In its equal protection analysis, Wilkins held that strict scrutiny was the applicable review standard, *31 noting that the “compelling interest test has been applied with one exception to all of the recent [federal] voting cases . . . .”[76] Rejecting the argument that an absolute denial of the right to vote was required to invoke strict scrutiny, the Wilkins Court held that strict scrutiny was appropriate because it was sufficient that the students could show “a burden” on their right to vote.[77] Applying the heightened standard, the Wilkins Court declared the statutory provision unconstitutional because it was not necessary to advance the state’s interest in “promoting a concerned and interested electorate” and in “insuring that students will not vote twice.”[78]
In Michigan State UAW, supra, this Court considered the constitutionality of MCL 168.509. The statute required that electors who had not voted or taken other specified action within the previous two years have their voter registration suspended, unless the elector completed an “application for continuation,” bearing the elector’s signature, address, and mother’s maiden name.[79] In resolving the case, the Court dealt “with only one issue”-whether the statute violated Const 1963, art 2, § 1 by imposing an additional voter qualification.[80] Inexplicably, the Michigan State UAW Court utilized *32 the strict scrutiny standard applicable in the equal protection context, art 1, § 2, in analyzing the art 2, § 1 question.[81]
In Michigan State UAW, the Attorney General argued that the statutory provision was permissible under art 2, § 4 of the Michigan Constitution, discussed supra. However, in analyzing this constitutional provision, the Court addressed only the Legislature’s authority to provide for voter registration, and did not address the explicit directive to preserve the purity of elections and guard against abuses of the elective franchise. The Attorney General also argued that the act of returning the application for continuation was a “small price to pay.” In response, the Court cited Wilkins and two United States Supreme Court cases in support of the conclusion that “[a]ny burden, however small, will not be permitted unless there is demonstrated a compelling state interest.”[82] The Court concluded by holding that, because the Legislature had other statutes in place that served to prevent fraudulent voting, the state “failed to demonstrate a compelling state interest” and the statute was “unconstitutional under Const 1963, art 2, § 1,” as adding an additional elector qualification.[83]
Properly read, neither Wilkins nor Michigan State UAW stands for the proposition that Michigan’s Equal Protection Clause, in contrast to the federal Equal Protection Clause, requires the application of strict *33 scrutiny review to every election law. Wilkins relied exclusively on United State Supreme Court jurisprudence in construing the Michigan equal protection provision as requiring the application of a strict scrutiny standard whenever “a burden” was placed on the right to vote. Notably, nothing in the Wilkins decision purported to differentiate between the state and federal equal protection provisions; rather, the provisions were read as coterminous for the purposes of the Wilkins analysis. However, as Burdick subsequently clarified, blanket application of strict scrutiny review to every election law was not constitutionally required under the federal Equal Protection Clause; rather, strict scrutiny review was constitutionally required only where an election law imposed a severe burden on the right to vote. Because Wilkins relied on a construction of the federal Equal Protection Clause that was subsequently repudiated by Burdick, its analytical underpinning has been destroyed and is of no utility in construing the Michigan Constitution.
Similarly, Michigan State UAW does not support the opposing Attorney General’s claim that the Michigan Constitution requires strict scrutiny review of all election regulations. The Michigan State UAW opinion did not purport to examine or rely on the Michigan Equal Protection Clause in its analysis at all. At issue in Michigan State UAW was the constitutionality of a voter registration regulation. It is unclear why the Court analyzed the voter registration regulation as an elector qualification issue under art 2, § 1, because the Legislature unquestionably possesses explicit constitutional authority over voter registration pursuant to art 2, § 4.[84] Regardless, the Court borrowed the strict *34 scrutiny standard, a doctrine rooted in equal protection principles, and applied it to the issue of whether a voter registration provision imposed an additional elector qualification under art 2, § l.[85]
Of significance, neither Wilkins nor Michigan State UAW considered or examined the effect of the constitutional directive found in art 2, § 4, requiring the Legislature to “enact laws to preserve the purity of elections” and to “guard against abuses of the elective franchise.” This oversight is of critical importance, because “every [constitutional] provision must be interpreted in the light of the document as a whole . . . ,”[86] Because our *35 constitutional provisions “ ‘are of equal dignity,’ ”[87] having been adopted simultaneously, “ ‘neither can logically trump the other.’ ”[88] Therefore, every effort should be made to construe constitutional provisions harmoniously, and no provision “should be construed to nullify or impair another.”[89]
Thus, as noted above, the Michigan Constitution does not compel that every election regulation be reviewed under strict scrutiny. Given that the appropriate standard by which to evaluate election laws must be compatible with our entire constitution, and must not nullify or impair any other constitutional provision, we adopt the “flexible test” articulated in Burdick when resolving an equal protection challenge to an election law under the Michigan Constitution. The Burdick test strikes the appropriate balance between protecting a citizen’s right to vote under art 1, § 2 and protecting against fraudulent voting under art 2, § 4.[90] Therefore, where an election law subjects the right to vote to “severe restrictions,” strict scrutiny review is applicable, and the regulation must be narrowly drawn to advance a compelling state interest.[91] However, when an election law imposes only “reasonable, nondiscriminatory restrictions” on the right to vote, the law is *36 upheld as advancing the important regulatory interest identified by the state. As we have previously concluded, MCL 168.523(1) does not impose a severe burden on the right to vote; rather, it imposes only a reasonable, nondiscriminatory restriction that furthers Michigan’s compelling regulatory interest in preventing voter fraud as well as enforcing the constitutional directive contained in art 2, § 4 to “preserve the purity of elections” and “to guard against abuses of the elective franchise” by ensuring that lawful voters not have their votes diluted. Therefore, the statute is valid under the Michigan Constitution.
V MCL 168.523(1) IS NOT AN UNCONSTITUTIONAL POLL TAX
The opposing Attorney General argues that by requiring voters to purchase a state-issued identification card, MCL 168.523(1) is “tantamount to a poll tax,” and violates the Twenty-fourth Amendment of the United States Constitution. US Const, Am XXIV provides:
The right of citizens of the United States to vote in any primary or other election... shall not be denied or abridged by the United States or any State by reason of failure to pay any poll tax or other tax.
The opposing Attorney General argues that the fee charged by the Secretary of State to obtain a state identification card ($10) or a driver’s license ($25) constitutes an impermissible poll tax. Moreover, counsel argues that the “real costs” incurred in obtaining photo identification are “much higher,” and are properly considered when determining whether the statute imposes an unconstitutional poll tax. Such “real costs” include the cost of transportation to reach the local Secretary of State office, the cost of taking time off work to go to the Secretary of State office, and the cost of *37 procuring supporting documentation necessary to obtain state-issued photo identification, such as a copy of a birth certificate.
The seminal case concerning poll taxes is Harper v Virginia Bd of Elections.[92] There, the United States Supreme Court struck down a Virginia law that imposed an annual poll tax of $1.5.0 on every resident over the age of 21 as “a precondition for voting.”[93] Virginia argued that if it could “demand from all an equal fee for a driver’s license,” then it could “demand from all an equal poll tax for voting.”[94] The Court held that the Virginia law was unconstitutional because the law made “the affluence of the voter or payment of any fee an electoral standard.”[95] Regarding any “familiar form of taxation,” the Harper Court stated the opinion did nothing to “impair its validity so long as” payment of fees is not “made a condition to the exercise of the franchise.”[96]
In Harman v Forssenius,[97] the Court considered the constitutionality of a Virginia law that required, as a condition of voting, an elector to either pay a poll tax or file an annual certificate of residence no later than six months before the election. Holding that the Twenty-fourth Amendment prohibited “ ‘onerous procedural requirements which effectively handicap exercise of the *38 franchise,’ ”[98] the Court struck down the certificate of residence requirement because it imposed “a real obstacle to voting” for those “who assert their constitutional exemption from the poll tax.”[99] The Court noted that the certificate of residence had to be filed every election year, at least six months before the election, and had to be witnessed or notarized. Unlike poll tax bills, which were sent directly to a voter’s residence, a certificate of residence had to be obtained from local officials or prepared by the voter, and filed “in person, or otherwise” with the city or county treasurer. The Court noted that the statute imposed “a cumbersome procedure,” and that it seemed “far preferable to mail in the poll tax payment upon receipt of the bill.”[100]
In this case, MCL 168.523(1) is not an unconstitutional poll tax under Harper because the statute does not condition the right to vote on the payment of any fee. A voter who does not otherwise possess adequate photo identification is not required to incur the costs of obtaining photo identification as a condition of voting. Instead, a voter may simply sign an affidavit in the presence of an election inspector. Nothing in the statute contemplates that a voter is required to incur any costs in the execution of an affidavit.
Moreover, the statute is not unconstitutional under Harman because signing an affidavit in the presence of an election inspector, as an alternative to presenting photo identification, is simply not an onerous procedural requirement that handicaps the exercise of the franchise. The procedure in MCL 168.523 bears no resemblance to the “cumbersome procedure” depicted in Harman. Fulfilling the requirement of MCL *39 168.523(1) requires only as much penmanship as is necessary to execute the affidavit, which is readily available at the election precinct. In Harman, the fact that the residency certificate was required to be “filed six months before the election” was significant, because such a requirement “perpetuales] one of the disenfranchising characteristics of the poll tax which the Twenty-fourth Amendment was designed to eliminate.”[101] Here, there is no requirement that an affidavit be executed in advance of the election; rather, an affidavit is executed on the day of the election. Because MCL 168.523(1) does not “erectD a real obstacle to voting,”[102] there is no constitutional infirmity under Harman.
Although no voter is ever compelled to procure photo identification as a condition for exercising his right to vote under the statute, we observe that our law provides a mechanism for some voters to receive a state identification card at no cost. Our law requires that the Secretary of State waive the customary fee for a state identification card if an applicant meets any of the conditions listed in MCL 28.292(14).[103] Thus, any voter *40 who elects to obtain photo identification for use at the polls is entitled to have the $10 fee waived entirely if he is elderly, disabled, or presents good cause to have the fee waived. Therefore, many of the categories of voters that the opposing Attorney General claims are disproportionately affected by the cost of procuring the entirely optional photo identification can in fact obtain it for free.[104]
Regarding the secondary costs cited by the opposing Attorney General — time, transportation, and the expense of procuring supporting documentation — we agree with the reasoning of the United States District Court for the Southern District of Indiana in rejecting a similar poll tax claim:[105]
This argument represents a dramatic overstatement of what fairly constitutes a “poll tax.” It is axiomatic that “(ejection laws will invariably impose some burden upon individual voters.” Thus, the imposition of tangential burdens does not transform a regulation into a poll tax. Moreover, the cost of time and transportation cannot plausibly qualify as a prohibited poll tax because these *41 same “costs” also result from voter registration and in-person voting requirements, which one would not reasonably construe as a poll tax. Plaintiffs provide no principled argument in support of this poll tax theory.[106]
Noting that the “only incidental cost which might plausibly approach being a poll tax is the fee assessed to obtain a birth certificate,” the Rokita court ultimately rejected the claim because the birth certificate fees were not “sufficiently tied to the requirements of voting as to constitute a ‘poll tax.’ ”[107] Here, even less of a burden is imposed on voters, since no voter need ever incur any secondary costs because of the affidavit alternative contained in MCL 168.523. Therefore, any incidental costs incurred by a voter who elects to obtain the optional identification card cannot be held to constitute a “poll tax.”
VI. RESPONSE TO THE DISSENTS
We are content to rest on the strength of the constitutional analysis we have made, but pause here briefly to address some of the more inflammatory and emo *42 tional arguments made in Justice CAVANAGH’s dissent.[108] It is clear that he passionately dislikes the enacted voter photo identification requirement and believes it to be “ill-advised” and founded on no empirical data showing that Michigan has a voter fraud problem. Whether the statute is an “ill-advised” policy choice is not a judgment open to the judiciary, this Court, or any member of it. For the reasons we have stated, whatever its policy merits, this enacted legislative policy choice is not one that is facially unconstitutional as the dissenters maintain. We turn now to some of the specific emotional arguments advanced by the dissent.
A. MICHIGAN HAS NO VOTER FRAUD PROBLEM
The interest in this case is more accurately presented as preventing in-person voter fraud when there is no evidence that in-person fraud actually exists.[109]
The sting of the dissent’s contention here is that the photo identification statute serves no purpose and therefore surely cannot serve a constitutionally significant one that could justify even the slightest burden that it might impose on a Michigan voter. Not even the opposing Attorney General argues that “no evidence” of such voter fraud exists; the opposing Attorney General suggests only that in-person voter fraud is “rare.”[110] *43 However, whether the incidence of in-person voter fraud is believed to be rare or frequent, the fact of the matter is that no voter identification was required before the enactment of MCL 168.523 and no one knows — or could possibly know — the frequency with which in-person voter fraud occurs at the polls.[111] More relevant to our constitutional inquiry is the fact that a legislature — particularly one given a constitutional mandate to “preserve the purity of elections” — is not required to wait for an electoral calamity before it may act to fulfill its obligation to preserve.[112] And while the dissent purports to focus on the right to vote, it does so by considering only one side of that right without reckoning with the obvious object of art 2, § 4 — that the right to vote includes the assurance that one’s vote will not be diluted by the votes of fraudulent voters. The statute at issue is clearly designed to promote this state constitutional value by requiring those who desire to cast in-person ballots to present identification establishing that they are the registered voters who they claim to be.
B. THE STATUTE IMPOSES A SEVERE BURDEN
The reality is that not all of our citizens live a life in which they have photo identification and obtaining photo identification solely to vote causes a severe burden.[113]
In a statutory regime that compels the state to issue free Michigan photo identification to its disabled, its *44 seniors, and its most impecunious citizens,[114] the dissent’s argument that the photo identification statute imposes a severe burden on anyone is simply facetious. But the argument is even more wrongheaded on another ground: Under this statute, no one need have or present photo identification at the poll; a voter need only sign an affidavit to vote and have that vote counted like those of every other voter appearing at the polls.[115]
Justice CAVANAGH contends that the ability of voters without photo identification to sign an affidavit in order to vote does not lessen the burden imposed by MCL 168.523 because a “likely scenario is that the challenge process will be used in some situations to harass and intimidate citizens” who sign an affidavit.[116] Although he conjures up images of voters being denied their right to vote at the whim of election officials, he ignores the clear statutory prohibition against such harassment in MCL 168.727(3), which provides that “[a] challenger shall not make a challenge indiscriminately and without good cause.” Moreover, a person who challenges a voter for the purpose of annoyance or delay is guilty of a misdemeanor. Thus, contrary to the assertions of Justice CAVANAGH, the use of the challenge process to *45 harass voters is deterred by subjecting the challenger to criminal penalties. For these reasons, the dissent errs by concluding that MCL 168.523 imposes a severe burden on the right to vote.
C. THE STATUTE WILL HAVE A DISPARATE IMPACT ON MINORITIES
The photo identification requirement will have a disparate impact on racial and ethnic populations, as well as poor voters, elderly voters, and disabled voters .... [T]he statute at issue will diminish the opportunity for thousands of citizens to participate in the political process.[117]
When all other arguments are unavailing, resorting to a claim of racial discrimination is a frequent substitute. Unfortunately, Justice CAVANAGH has chosen this tack.[118]
Since the act of signing one’s name to an affidavit is too trivial an act to sustain the weight of Justice CAVANAGH’s overwrought burden argument, he has been forced to ignore the fact that this case involves a facial challenge to the statute and argues that the statute, as it will be applied in the future, will be subject to abuses that will be discriminatorily visited upon some Michigan citizens.[119] We simply note that, whatever may happen once the statute is enforced, our task in this case is to determine only whether the statute is capable of any valid application.[120] We conclude that it passes constitutional muster under a facial challenge because *46 the voter photo identification statute imposes no significant, much less “severe,” burden on Michigan’s voters.
VIL CONCLUSION
In this advisoiy opinion, we have carefully considered the arguments advanced by the Attorney General both challenging and defending the constitutionality of 2005 PA 71. For the reasons previously articulated, the photo identification requirement in MCL 168.523(1) is facially constitutional and withstands scrutiny under both the Michigan Constitution and the United States Constitution. Under the balancing test articulated by Burdick, supra, the photo identification requirement is a reasonable, nondiscriminatory restriction designed to preserve the purity of elections and to prevent abuses of the electoral franchise, as demanded by art 2, § 4 of the Michigan Constitution, thereby ensuring that lawful voters not have their votes diluted. Moreover, because no voter is required to incur the costs of obtaining a photo identification card as a condition of voting, the statute does not impose the payment of a fee as “a condition to the exercise of the franchise”[121] and therefore is not an unconstitutional poll tax under the Twenty-fourth Amendment of the United States Constitution.
Taylor, C.J., and Weaver, Corrigan, and Markman, JJ., concurred with YOUNG, J.

 504 US 428; 112 S Ct 2059; 119 L Ed 2d 245 (1992).

 See 1996 PA 583.

 See OAG, 1997-1998, No 6930, p 1 (January 29, 1997). We note in passing that OAG, No 6930 appears not to have been initiated in accordance with MCL 14.32, which requires the Attorney General to issue opinions only in response to “questions of law submitted to him by the legislature, or by either branch thereof... .”

 OAG No 6930, pp 3, 5.

 Relying on obiter dictum found in Traverse City School Dist v Attorney General, 384 Mich 390, 407 n 2; 185 NW2d 9 (1971), both the supporting and the opposing Attorney General maintain that opinions issued by the Attorney General are “binding upon state agencies.” Because the effect of an Attorney General opinion is beyond the scope of the advisory opinion, we decline to address the statutory or constitutional *9 basis for the claim that opinions of the Attorney General are binding in the present opinion. Cf. East Grand Rapids School Dist v Kent Co Tax Allocation Bd, 415 Mich 381; 330 NW2d 7 (1982).

 See the report of the National Commission on Federal Election Reform (Ford-Carter Commission), To Assure Pride and Confidence in the Electoral Process (August 2001). The commission was “formed in the wake of the 2000 election crisis” to “offer a bipartisan analysis” of election reform, <http://www.reformelections.org/ncfer.asp> (accessed December 19, 2006).

 42 USC 15301 through 15545.

 See 42 USC 15483(b)(2). The statute permits a voter to present “current and valid photo identification” or “a copy of a current utility bill, bank statement, government check, paycheck, or other government document that shows the name and address of the voter.”

 42 USC 15484 (emphasis added).

 See Commission on Federal Election Reform (hereinafter Carter-Baker Commission), Building Confidence in U.S. Elections, p 1 (September 19, 2005). This 21-member bipartisan commission was cochaired by *10 former President Jimmy Carter and former United States Secretary of State James A. Baker, III. <http://www.american.edu/ia/cfer/> (accessed December 19, 2006).

 Carter-Baker Commission, supra at 21. The Carter-Baker Commission recommended that states require voters to use the “REAL ID card” to vote. The Real ID Act of 2005, PL 109-13, 2005 HR 1268, was enacted on May 11, 2005. The act requires that federal agencies accept only state-issued driver’s licenses and identification cards that meet stringent information requirements.

 Carter-Baker Commission, supra at 18.

 See 2006 House Journal 17 (Resolution No. 199, February 21, 2006).

 474 Mich 1230 (2006). To prevent confusion, the terms “supporting Attorney General” and “opposing Attorney General” will be used throughout this opinion to identify the briefs and argument submitted by the Attorney General as the proponent and opponent, respectively, of the constitutionality of 2005 PA 71.

 Const 1963, art 1, § 2.

 US Const, Am XIV Crego v Coleman, 463 Mich 248, 258; 615 NW2d 218 (2000), citing Frame v Nehls, 452 Mich 171, 183; 550 NW2d 739 (1996), and Doe v Dep’t of Social Services, 439 Mich 650, 670-671; 487 NW2d 166 (1992). However, in Lind v Battle Creek, 470 Mich 230, 235; 681 NW2d 334 (2004) (YOUNG, J., concurring), it was noted that Const 1963, art 1, § 2 contained specific antidiscrimination provisions not found in its federal counterpart.

 Cruz v Chevrolet Grey Iron Div of Gen Motors Corp, 398 Mich 117, 127; 247 NW2d 764 (1976).

 DeRose v DeRose, 469 Mich 320; 666 NW2d 636 (2003); Tolksdorf v Griffith, 464 Mich 1; 626 NW2d 163 (2001); In re Trejo Minors, 462 Mich 341; 612 NW2d 407 (2000).

 Judicial Attorneys Ass’n v Michigan, 459 Mich 291, 310; 586 NW2d 894 (1998) (Taylor J., dissenting).

 Straus v Governor, 459 Mich 526, 543; 592 NW2d 53 (1999), quoting United States v Salerno, 481 US 739, 745; 107 S Ct 2095; 95 L Ed 2d 697 (1987) (citation omitted). A facial challenge is a claim that the law is “invalid in toto — and therefore incapable of any valid application ... .” Steffel v Thompson, 415 US 452, 474; 94 S Ct 1209; 39 L Ed 2d 505 (1974).
The other type of constitutional challenge is an “as applied” challenge. An “as applied” challenge considers the specific application of a facially valid law to individual facts. Crego v Coleman, 463 Mich 248; 615 *12 NW2d 218 (2000); Boddie v Connecticut, 401 US 371; 91 S Ct 780; 28 L Ed 2d 113 (1971). An “as applied” challenge is not possible at this juncture, as the statute has yet to he enforced.

 MCL 8.3u provides:
The provisions of any law or statute which is re-enacted, amended or revised, so far as they are the same as those of prior laws, shall be construed as a continuation of such laws and not as new enactments. If any provision of a law is repealed and in substance re-enacted, a reference in any other law to the repealed provision shall be deemed a reference to the re-enacted provision.

 Const 1963, art 4, § 27 (“No act shall take effect until the expiration of 90 days from the end of the session at which it was passed, but the *13 legislature may give immediate effect to acts by a two-thirds vote of the members elected to and serving in each house.”).

 Because, in reliance on OAG No 6930, the Secretary of State has never enforced the statute or promulgated rules and regulations, there is *14 no basis for this Court to speculate regarding what type of identification might eventually constitute “generally recognized picture identification . ...” The duty to promulgate rules and regulations concerning acceptable alternate photo identification lies exclusively with the Secretary of State under MCL 168.31(1).

 Any voter, including those voters presenting photo identification, may be challenged pursuant to MCL 168.727. The statute imposes differing requirements on different challengers. An election inspector is required to challenge a ballot applicant “if the inspector knows or has good reason to suspect that the applicant is not a qualified and registered elector of the precinct, or if a challenge appears in connection with the applicant’s name in the registration book.” A registered elector may challenge an applicant “if the elector knows or has good reason to suspect that individual is not a registered elector in that precinct.” MCL 168.727(1). Those who challenge voters may not “challenge indiscriminately” or “without good cause,” and face criminal sanctions if qualified voters are challenged for the purpose of annoyance or delay. MCL 168.727(3).
Once challenged, a voter is required to swear to answer truthfully and answer questions “concerning his qualifications as an elector ... .” MCL 168.729. If the challenged voter answers qualification questions satisfactorily, the challenged voter “shall be entitled to receive a ballot and vote.” The ballot cast by a challenged voter is marked (and the mark subsequently concealed) with a number corresponding to the voter’s poll list number, and is counted as a regular ballot. MCL 168.745; MCL 168.746. The marked ballot becomes relevant only in the event of litigation surrounding a contested election, where the challenged voter’s qualifications to vote are disputed. MCL 168.747; MCL 168.748.

 Webster’s New Universal Dictionary, Unabridged Edition (1996), p 1893.

 “If the signature or an item of information [from the voter registration list] does not correspond, the vote of the person shall be challenged, and the same procedure shall be followed as provided in this act for the challenging of an elector.” MCL 168.523(1) (emphasis added).

 People v Crucible Steel Co of America, 150 Mich 563; 114 NW 350 (1907); Helder v Sruba, 462 Mich 92; 611 NW2d 309 (2000); Robertson v DaimlerChrysler Corp, 465 Mich 732; 641 NW2d 567 (2002).

 There is no basis to conclude that a voter who merely executes an affidavit, without more, presents a challenger with “good reason to suspect” that the voter is not a registered elector of a precinct.

 See San Antonio Independent School Dist v Rodriguez, 411 US 1, 35 n 78; 93 S Ct 1278; 36 L Ed 2d 16 (1973) (“[T]he right to vote, per se, is not a constitutionally protected right....”).

 Reynolds v Sims, 377 US 533, 562; 84 S Ct 1362; 12 L Ed 2d 506 (1964) (citation omitted).

 Dunn v Blumstein, 405 US 330, 336; 92 S Ct 995; 31 L Ed 2d 274 (1972).

 Id. (States may “impose voter qualifications,” and “regulate access to the franchise in other ways.”) See also Carrington v Rash, 380 US 89, 91; 85 S Ct 775; 13 L Ed 2d 675 (1965) (noting that states have historically possessed “ ‘broad powers to determine the conditions under which the right of suffrage may be exercised,’ ” quoting Lassiter v Northampton Co Bd of Elections, 360 US 45, 50; 79 S Ct 985; 3 L Ed 2d 1072 [1959]).

 The constitutional authority to prevent fraudulent voting was first given to the Legislature in the 1850 Michigan Constitution. See Const 1850, art 7, § 6 (“Laws may be passed to preserve the purity of elections and guard against abuses of the elective franchise.”). The 1908 Constitution altered the language of the provision to make clear that the duty was obligatory, explicitly providing that “[Raws shall be passed to preserve the purity of elections and guard against abuses of the elective franchise ....” Const 1908 art 3, § 8. When the 1963 Constitution was ratified by the people, the responsibility to pass laws preventing fraudulent voting was explicitly vested in the Legislature, and the Address to the People pointedly stated that “[t]he legislature is specifically directed to enact corrupt practices legislation.” 2 Official Record, Constitutional Convention 1961, p 3366 (emphasis added).

 Attorney General ex rel Conely v Detroit Common Council, 78 Mich 545, 559; 44 NW 388 (1889) (emphasis added).

 Brown v Kent Co Bd of Election Comm’rs, 174 Mich 477, 479; 140 NW 642 (1913) (emphasis added).

 Purcell v Gonzalez, 549 US_,_; 127 S Ct 5, 7; 166 L Ed 2d 1, 4 (2006). See also Burson v Freeman, 504 US 191, 199; 112 S Ct 1846; 119 L Ed 2d 5 (1992); Rosario v Rockefeller, 410 US 752; 93 S Ct 1245; 36 L Ed 2d 1 (1973).

 US Const, art I, § 4, cl 1.

 285 US 355, 366; 52 S Ct 397; 76 L Ed 795 (1932) (emphasis added).

 Burdick, supra at 433; Tashjian v Republican Party of Connecticut, 479 US 208, 217; 107 S Ct 544; 93 L Ed 2d 514 (1986); Sugarman v Dougall, 413 US 634; 93 S Ct 2842; 37 L Ed 2d 853 (1973); Boyd v Nebraska ex rel Thayer, 143 US 135, 161; 12 S Ct 375; 36 L Ed 103 (1892) (“Each State has the power to prescribe the qualifications of its officers and the manner in which they shall be chosen ....”).

 Burson, supra at 199.

 Purcell, supra, 549 US at_; 127 S Ct at 7; 166 L Ed 2d at 4, quoting Reynolds v Sims, supra at 555. Voter disenfranchisement through vote dilution is a problem that is also addressed by the Voting Rights Act, 42 USC 1973.

 Anderson v Celebrezze, 460 US 780, 788 n 9; 103 S Ct 1564; 75 L Ed 2d 547 (1983).

 Burdick, supra at 433 (citation omitted). See also Timmons v Twin Cities Area New Party, 520 US 351, 358; 117 S Ct 1364; 137 L Ed 2d 589 (1997) (holding that “States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election and campaign-related disorder”).

 Attorney General of New York v Soto-Lopez, 476 US 898, 906 n 6; 106 S Ct 2317; 90 L Ed 2d 899 (1986). Suspect categories include race, alienage, or national origin.

 Under a strict scrutiny standard of constitutional review, “[t]he State must show that the ‘regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end.’ ” Burson, supra at 198 (quoting Perry Ed Ass’n v Perry Local Educators’ Ass’n, 460 US 37, 45; 103 S Ct 948; 74 L Ed 2d 794 [1983]).

 Burdick, supra at 433.

 Id. at 434 (internal citation omitted).

 Timmons, supra at 359. See also Storer v Brown, 415 US 724, 730; 94 S Ct 1274; 39 L Ed 2d 714 (1974) (noting that there is “no litmus-paper test for separating those [election] restrictions that are valid from those that are invidious under the Equal Protection Clause”).

 As the Supreme Court has observed, all election laws “invariably impose some burden upon individual voters.” Burdick, supra at 433. In Michigan, a voter is required to meet minimum age and residency qualifications to register as an elector and must register to vote by executing a registration affidavit in accordance with MCL 168.495. The voter is required to vote at the correct polling place during the hours the polls are open (unless they qualify for an absentee ballot), wait in line, execute an application with the voter’s signature and residence, and utilize whatever voting machine is available at the polling place. Moreover, the voter may not have his write-in vote counted unless the candidate has filed a declaration of intent under MCL 168.737a. Michigan’s various election requirements invariably impose some burden on the voter. However, as the Supreme Court noted in Marston v Lewis, 410 US 679, 680; 93 S Ct 1211; 35 L Ed 2d 627 (1973), “a person does not have a [state or] federal constitutional right to walk up to a voting place on election day and demand a ballot.” Rather, Michigan has a compelling interest in ensuring that its election processes are honest, orderly, and efficient.

 According to an affidavit submitted by the Director of the Bureau of Driver and Vehicle Records for the Michigan Department of State, approximately 95 percent of registered voters in the state of Michigan already possess either a driver’s license or a state identification card. Of the remaining five percent of registered voters, it is unknown how many possess “other generally recognized picture identification . ...” As previously indicated, see n 23, the Secretary of State has not promulgated rules regarding what kind of “alternative” photo identification will satisfy this requirement.

 Historically, some mechanism of voter identification has been an integral part of the voting process. Harris, Election Administration in the United States (Brookings Institution Press, 1934), ch 6, pp 221-222.

 Opposing Attorney General brief, p 12.

 We have already considered and rejected the opposing Attorney General’s argument that the challenge procedure delineated in MCL 168.727 is required to be applied to every voter who utilizes the affidavit alternative. All voters, without regard to whether they possess photo identification, face the possibility of challenge pursuant to the statute. See n 24 of this opinion.

 A provisional ballot is cast when “an individual who is not listed on the voter registration list” seeks to cast a ballot. MCL 168.523a(2). HAVA requires that a voter sign a sworn statement as a condition of casting a provisional ballot. 42 USC 15482(a)(2); 42 USC 15483(b)(2)(B).

 MCL 168.523a(5).

 MCL 168.813(1). By contrast, a vote cast pursuant to the affidavit provision of MCL 168.523 is tabulated on the day of the election like every other vote.

 Crawford v Marion Co Election Bd, 472 F3d 949, 952 (CA 7, 2007).

 Purcell, supra 549 US at_; 127 S Ct at 7; 166 L Ed 2d at 4-5.

 Letter from Secretary of State Terri Lynn Land to Attorney General Michael A. Cox, dated April 20, 2006. See also Crawford, supra at 953, describing in detail the “extreme difficulty of apprehending a voter impersonator.”

 See Burson, supra at 208. “Voter intimidation and election fraud are successful precisely because they are difficult to detect.”

 In-person voter fraud could include impersonation of a registered voter, casting a vote in the name of a deceased voter, or casting a vote in the name of a fictional registered voter.

 See Const 1963, art 2, § 4. In fact, a voter’s ballot is required to be rejected if any part of the ballot is exposed to any person. MCL 168.738(2). If the voter’s ballot is rejected for exposure, the “elector shall not be allowed to vote at the election.” Id.

 Burson, supra at 209.

 Opposing Attorney General brief, pp 20, 21. See also Overton, Voter identification, 105 Mich L R 631 (2007) (urging on policy grounds that lawmakers await better empirical studies before imposing potentially antidemocratic measures and that the judiciary should demand statistical data.). Given that voter fraud is both covert and criminal, it is hard to imagine how an “empirical study” of the kind demanded by the opponents of voter identification requirements could be designed or executed.

 Timmons, supra, 520 US at 364.

 Munro v Socialist Workers Party, 479 US 189, 195-196; 107 S Ct 533; 93 L Ed 2d 499 (1986).

 The Equal Protection Clause “does not compel... legislatures to prohibit all like evils, or none.” United, States v Carolene Products Co, 304 US 144, 151; 58 S Ct 778; 82 L Ed 1234 (1938).

 McDonald v Chicago Bd of Election Comm’rs, 394 US 802, 809; 89 S Ct 1404; 22 L Ed 2d 739 (1969) (citation omitted).

 The opposing Attorney General also argues that MCL 168.523(1) is not justified because “an effective framework for detecting and deterring voter fraud is already in place in Michigan.” Opposing Attorney General brief, p 21. In support of this argument, counsel cites MCL 168.932a. This statute, which was enacted by 1996 PA 583, imposes criminal penalties for those who assume a fictitious name or impersonate another for the purposes of voting. However, that Michigan criminalizes in-person voter fraud does not address Michigan’s undisputed interest in preventing fraud in the first instance, nor do criminal sanctions provide a means of detecting fraud. Moreover, it is unclear how the imposition of criminal penalties could remedy the harm inflicted on our electoral system by a fraudulently cast ballot.

 Williamson v Lee Optical of Oklahoma, Inc, 348 US 483, 489; 75 S Ct 461; 99 L Ed 563 (1955) (emphasis added; internal citations omitted).

 385 Mich 670; 189 NW2d 423 (1971).

 387 Mich 506; 198 NW2d 385 (1972).

 The term “political rights” is found in the nondiscrimination clause of art 1, § 2 rather than the Equal Protection Clause. Const 1963, art 1, § 2 states in full:
No person shall be denied the equal protection of the laws; nor shall any person be denied the enjoyment of his civil or political rights or be discriminated against in the exercise thereof because of religion, race, color or national origin. The legislature shall implement this section by appropriate legislation.

 Opposing Attorney General brief, p 8.

 Wolcott v Holcomb, 97 Mich 361; 56 NW 837(1893); People v Osborn, 170 Mich 143; 135 NW 921 (1912); Attorney General ex rel Miller v Miller, 266 Mich 127; 253 NW 241 (1934).

 Wilkins, supra at 681.

 Id. at 684.

 Id. at 687, 685.

 Michigan State UAW, supra at 522 (Brennan, J., dissenting). A notice of suspension, along with the application for continuation, was mailed to the elector’s address 30 days before the elector’s registration was suspended.

 Michigan State UAW, supra at 513. Const 1963, art 2, § 1, provides:
Every citizen of the United States who has attained the age of 21 years, who had resided in this state six months, and who meets the requirements of local residence provided by law, shall be an *32 elector and qualified to vote in any election except as otherwise provided in this constitution. The legislature shall define residence for voting purposes.

 In support of the application of strict scrutiny to art 2, § 1, a provision setting forth voter qualifications, the Michigan State UAW Court exclusively cited equal protection cases, including Wilkins, supra.

 Michigan State UAW, supra at 516.

 Id. at 520.

 Const 1963, art 2, § 1 sets forth the minimum characteristics that electors must possess before they become qualified to vote “except as *34 otherwise provided” — citizenship, age, and residency. Const 1963, art 2, § 4 vests in the Legislature the exclusive authority to regulate the time, place, and manner of elections, as well as the authority to provide for a system of voter registration. Thus, contrary to Justice Kelly’s assertions, both constitutional provisions play a vital and necessary role in a citizen’s right to cast a ballot on election day.

 Justice Kelly also relies on Socialist Workers Party v Secretary of State, 412 Mich 571; 317 NW2d 1 (1982), to argue that Const 1963, art 1, § 2 requires strict scrutiny. However, Socialist Workers Party never concludes that the Michigan Constitution independently requires strict scrutiny. Instead, this Court determined that strict scrutiny would apply under the First and Fourteenth amendments of the federal constitution, citing federal caselaw. See id. at 587-590. After concluding that the law at issue violated the First and Fourteenth amendments, this Court summarily held that art 1, § 2 had been violated as well, relying on the “ ‘frequent past expressions of this Court that the Michigan Constitution “secures the same right of equal protection” as is secured by the Equal Protection Clause of the Fourteenth Amendment.’ ” Id. at 600 n 21, quoting Governor v State Treasurer, 390 Mich 389, 395; 212 NW2d 711 (1973) (T.G. Kavanagh, J., concurring), quoting Fox v Employment Security Comm, 379 Mich 579, 588; 153 NW2d 644 (1967). Because Socialist Workers Party expressly stated that it did not rely on the independent force of the Michigan Constitution, Socialist Workers Party does not indicate that art 1, § 2 requires strict scrutiny.

 Lapeer Co Clerk v Lapeer Circuit Court, 469 Mich 146, 156; 665 NW 2d 452 (2003). See also Sault Ste Marie City Comm v Sault Ste Marie City Attorney, 313 Mich 644; 21 NW2d 906 (1946); City of Lansing v Ingham Co Clerk, 308 Mich 560; 14 NW2d 426 (1944).

 In re Probert, 411 Mich 210, 232-233 n 17; 308 NW2d 773 (1981) (citation omitted).

 Straus v Governor, 459 Mich 526, 533; 592 NW2d 53 (1999) (citation omitted).

 Lapeer Co Clerk, supra at 156.

 Contrary to Justice Kelly’s assertions, we are not “simply following] federal precedent in lockstep.” Post at 109. As the preceding analysis demonstrates, we have carefully considered the requirements of art 1, § 2 in light of art 2, § 4, and determined that the test enunciated in Burdick gives proper meaning and effect to hoth constitutional provisions. Justice Kelly, on the other hand, fails to adequately address the impact of art 2, §4.

 Burdick, supra at 434.

 383 US 663; 86 S Ct 1079; 16 L Ed 2d 169 (1966).

 Id. at 665 n 1.

 Id. at 668.

 Id. at 666.

 Id. at 669 (emphasis added). The Harper opinion overruled Breedlove v Suttles, 302 US 277; 58 S Ct 205; 82 L Ed 252 (1937), where the Court had previously held that it was constitutionally permissible “[t]o make payment of poll taxes a prerequisite of voting . . . .” Id. at 283.

 380 US 528; 85 S Ct 1177; 14 L Ed 2d 50 (1965).

 Id. at 541 (citation omitted).

 Id.

 Id. at 541, 542.

 Harman, supra at 542.

 Id. at 541.

 MCL 28.292 (14) provides:
The secretary of state shall waive the fee under this section if the applicant is any of the following:
(a) A person 65 years of age or older.
(b) A person who has had his or her operator’s or chauffeur’s license suspended, revoked, or denied under the Michigan vehicle code, 1949 PA 300, MCL 257.1 to 257.923, because of a mental or physical infirmity or disability.
(c) A person who presents evidence of statutory blindness as provided in 1978 PA 260, MCL 393.351 to 393.368.
(d) A person who presents other good cause for a fee waiver.
*40 (e) Beginning January 1, 2007, a person who wishes to add or remove a heart insignia described in subsection (l)(f).

 Additionally, the elderly and the disabled are entitled to cast absentee ballots pursuant to MCL 168.758(1), alleviating the need to vote at an election precinct and either present photo identification or execute an affidavit.

 Indiana Democratic Party v Rokita, 458 F Supp 2d 775, 827 (SD Ind, 2006) (internal citation omitted), aff d sub nom Crawford v Marion Co Election Bd, 472 F3d 949 (CA 7, 2007).
In Rokita, the Indiana statute at issue required a voter to present valid photo identification issued either by the federal government or the state of Indiana. In the event a voter did not possess the requisite identification, the voter was required to be challenged, and could only cast a provisional ballot after executing an affidavit. In order to have the provisional ballot counted, the voter was required to provide proof of identity by noon on the second Monday following the election.

 We acknowledge that in Common Cause/Georgia v Billups, 406 F Supp 2d 1326, 1370 (ND Ga, 2005), the court held that a statute requiring voter photo identification constituted a poll tax because a voter had to “arrange for transportation,” wait in line, and sign a fee waiver affidavit that “may require the voter to swear or affirm to facts that simply are not true” in order to obtain photo identification at no cost. However, less than one year later, the same federal judge adopted the poll tax analysis of Rokita, thereby undercutting the prior holding sub silentio. See Common Cause/Georgia v Billups, 439 F Supp 2d 1294, 1354-1355 (ND Ga, 2006).

 Rokita, supra at 827, 828. The Rokita court noted that the plaintiff had “provided no evidence” that anyone would actually have to incur the costs of obtaining a birth certificate in order to obtain identification. Moreover, other forms of documentation that could be used to obtain photo identification were issued by the federal government, whose requirements and incidental fees were outside the control of the state.

 Because the arguments made in Justice Kelly’s dissenting opinion overlap with the arguments made in Justice Cavanagh’s opinion, there is no need to address her arguments separately unless otherwise indicated.

 Post at 57 (emphasis in original). See also Justice Kelly’s dissent, post at 94. (“[T]hose arguing in favor of the photo identification requirements have not come forward with any documented instances of in-person voter fraud.”).

 Interestingly, amicus curiae supporting the constitutionality of the statute have presented certified death certificates of 46 persons who “voted” in the November 2004 election, despite the ordinarily indisposing condition of being dead at the time. All these persons died well in advance *43 of the election, with dates of death ranging from 16 months to more than 12 years prior to the November 2004 election. A surprising number of these deceased “voters” apparently voted at their precinct.

 See n 59 of this opinion.

 McDonald v Chicago Bd of Election Comm’rs, supra n 68.

 Post at 63.

 See n 103 of this opinion.

 While Justice KELLY maintains that the “affidavit option itself” “interferes” with the right to vote, post at 91, she does not explain how the “minor obstacle” of signing one’s signature is any different that affixing a signature to the required election application under MCL 168.523. Justice Kelly also suggests that “signature matching” would be a “less restrictive alternative” than either showing photo identification or signing an affidavit. Post at 95. However, it should be noted that signature matching necessarily requires a signature, and does not obviate the necessity of confirming that the person at the poll is the person he claims to be. Thus, it would appear that Justice Kelly objects to the legislative choice in determining the identity of a potential voter.

 Post at 73.

 Id. at 64.

 Indeed, Justice Cavanagh appears to have come perilously close to suggesting that the Legislature was motivated in enacting this statute by the desire to suppress minority voters. Post at 57-59.

 Post at 63-66.

 See Steffel cited in n 20 of this opinion. Should it occur that the statute is discriminatorily applied when it is enforced, the constitutionality of its enforcement will then be at issue and can be challenged at that time.

 Harper, supra at 669.