*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# S T A T E   O F   M I C H I G A N

# C O U R T   O F   A P P E A L S

LEAGUE OF WOMEN VOTERS OF MICHIGAN,
DEBORAH BUNKLEY, ELIZABETH CUSHMAN,
and SUSAN SMITH,

      Plaintiffs,

v

SECRETARY OF STATE,

      Defendant.

FOR PUBLICATION
July 14, 2020

No. 353654

Before: SAWYER, P.J., and GLEICHER and RIORDAN, JJ.

RIORDAN, J. (*concurring*).

I concur with the majority. I write separately to further explain that although it is within the province of this Court to grant the extraordinary remedy of mandamus relief when merited, to do so in this instance would be an abuse of discretion. *LeRoux v Secretary of State*, 465 Mich 594, 606; 640 NW2d 849 (2002); *O'Connell v Dir of Elections*, 316 Mich App 91, 100; 891 NW2d 240 (2016); *Berry v Garrett*, 316 Mich App 37, 41; 890 NW2d 882 (2016).

## COUNT I

I agree with the majority in that Const 1963, art 2, § 4(1)(g) requires ballots postmarked by election day to be counted, but that it does not render unconstitutional the 8 p.m. received-by deadline set forth in MCL 168.764a. If an absentee voter ballot is not received before the close of the polls on election day, even pursuant to Proposal 3, which was overwhelmingly approved by Michigan voters in 2018, the ballot cannot be counted regardless of the date displayed in the postmark. *Lantz v Southfield City Clerk*, 245 Mich App 621, 626; 628 NW2d 583 (2001).

This conclusion is consistent with the objective of constitutional interpretation which is to determine the text's original meaning to the ratifiers, here the people of the State of Michigan, at the time of ratification. *Citizens Protecting Michigan's Constitution v Secy of State*, 503 Mich 42, 61; 921 NW2d 247 (2018). Therefore, the issue in this matter must be interpreted using the common understanding of the people at the time of ratification—a pursuit which involves applying the ordinary meaning of each term used at the time of ratification, unless technical, legal terms are

used. *Paquin v City of St Ignace*, 504 Mich 124, 129-130; 934 NW2d 650 (2019). Also applicable in this case is a secondary rule of state constitutional interpretation which requires that "wherever possible an interpretation that does not create constitutional invalidity is preferred to one that does." *Traverse City Sch Dist v Attorney General*, 384 Mich 390, 406; 185 NW2d 9 (1971).

There is no issue that the people, by a very large majority, voted for and chose the option of voting by mail. Nor is there any dispute that "voting" is a process which necessarily includes having one's vote counted. See *Reynolds v Sims*, 377 US 533, 554; 84 S Ct 1362; 12 L Ed 2d 506 (1964) (the fundamental right to vote encompasses the right to have those votes actually counted); *Wesberry v Sanders*, 376 US 1, 17; 84 S Ct 526; 11 L Ed 2d 481 (1964); *Kramer v Union Free School Dist No 15*, 395 US 621, 626; 89 S Ct 1886; 23 L Ed 2d 583 (1969). However, the right to vote is not absolute and limitations placed upon it are not *per se* unconstitutional. *In re Request for Advisory Opinion Regarding Constitutionality of 2005 PA 71*, 479 Mich 1, 16, 20; 740 NW2d 444 (2007) (a citizen's right to vote is fundamental, but is not unfettered; it competes with the state's compelling interest in preserving the integrity of its elections and the Legislature's constitutional obligation to preserve the purity of elections and to guard against abuses of the elective franchise).

Article 2, § 4 provides for a registered voter "[t]he right . . . to vote an absent voter ballot without reason, during the forty (40) days before an election, *and* the right to choose whether the absent voter ballot is applied for, received and submitted in person or by mail." (Emphasis added). The parties submit no evidence whatsoever to support their notion that when the voters adopted the amendment in 2018, that they did so with the common understanding that the right to vote was absolute regardless of its timing, or even that it encompassed a right to have absentee ballots counted after the statutory received-by deadline of 8 p.m. on election day. *Michigan United Conservation Clubs v Secy of State*, 464 Mich 359, 376–77; 630 NW2d 297 (2001) (YOUNG, J., concurring) ("Those who suggest that the meaning to be given a provision of our constitution varies from a natural reading of the constitutional text bear the burden of providing the evidence that the ratifiers subscribed to such an alternative construction. Otherwise, the constitution becomes no more than a Rorschach exercise in which judges project and impose their personal views of what the constitution should have said.").[1] There is no evidence that the voters were unaware of the existing received-by deadline, or that they were unaware that the right to vote has

---

[1] To ascertain the common understanding of the constitutional provision, the Court may also consider the circumstances surrounding the adoption of a constitutional provision and the purpose sought to be accomplished by it, but the process of ascertaining the understanding of the framers should not be confused with the process of ascertaining the understanding of the ratifiers. *Traverse City School Dist*, 384 Mich at 405. The ballot summary of Proposal 3 provides a statement of purpose regarding the drafters' intent, and offers some insight into the circumstances surrounding the referendum. However, it does not necessarily reflect the intent of the ratifiers, and thus, it is not particularly helpful in discerning their common understanding in relation to the received-by deadline. Nor is it within the province of the judicial branch to insert that purpose now.

never been recognized as completely unfettered by this Court—or by any higher court, or by any controlling authority or political branches of government anywhere in this state or this country.[2]

In the absence of any evidence that the ratifiers intended to expand the right to vote beyond its historically understood and accepted bounds and transform it into an absolute right, I cannot conclude that the existing received-by deadline is unconstitutional by virtue of the adopted language in Proposal 3, particularly when our rules of construction dictate otherwise. *Traverse City Sch Dist*, 384 Mich at 406 ("wherever possible an interpretation that does not create constitutional invalidity is preferred to one that does"). Even the most liberal construction of the provision does not compel a different result where there is no evidence that the purpose of the provision was to create an unfettered and absolute right to absentee voting. Art 2, § 4(1) (stating that the provisions in the subsection "shall be liberally construed in favor of voters' rights *in order to effectuate its purposes*" (emphasis added)).

In 2018, the voters adopted the referendum *as written*. At that time, the drafters could have included an alternative received-by deadline in the ballot initiative but, from the plain language of the referendum, decided not to. Since the time of the referendum's passage, the political process has had every opportunity to supplement the amendment that was passed. Eighteen months after the referendum, a bill was introduced in the Legislature to address some of these issues, but nothing further has been done to enact the legislation advocated by plaintiffs, and seemingly, by defendant.[3] While the Legislature may yet act to address these issues in advance of the general election, this Court cannot command it do so. As we have previously stated:

> [w]e cannot serve as political overseers of the executive or legislative branches, weighing the costs and benefits of competing political ideas or the wisdom of the executive or legislative branches in taking certain actions, but may only determine whether some constitutional provision has been violated by an act (or omission) of the executive or legislative branch. As has been long recognized, when a court confronts a constitutional challenge it must determine the controversy stripped of

---

[2] Conceptually, voting has evolved from a political right or privilege, to a natural right, and now to a civic duty. See *Yick Wo v Hopkins*, 118 US 356; 6 S Ct 1064; 30 L Ed 220 (1886) (the right to vote is "a privilege merely conceded by society"); *Wesberry*, 376 US at 17 (decided in 1964 and stating that persons qualified to vote have a constitutional right to have their vote counted); *Russell v Lundergan-Grimes*, 784 F3d 1037, 1052 (CA 6, 2015), citing *Crawford v Marion Cnty Election Bd*, 553 US 181, 203; 128 S Ct 1610; 170 L Ed 2d 574 (2008) (plurality opinion) for the proposition that citizens cannot demand as a constitutional entitlement an environment in which fulfilling the civic duty of voting is effortless. To the extent that "the right to vote" is a legal term of art, the case law at the time of ratification does not support an interpretation that the right to vote is unfettered, much less the right to vote absentee is unfettered. *In re Request for Advisory Opinion*, 479 Mich at 20; *McDonald v Bd of Election Com'rs of Chicago*, 394 US 802, 807; 89 S Ct 1404; 22 L Ed 2d 739 (1969).

[3] As the majority notes, 2020 HB 5807, introduced May 20, 2020, would address some of the issues raised.

all digressive and impertinently heated veneer lest the Court enter—unnecessarily this time—another thorny and trackless bramblebush of politics. [*Hammel v Speaker of House of Representatives*, 297 Mich App 641, 647; 825 NW2d 616 (2012), quoting *Straus v Governor*, 459 Mich 526, 531; 592 NW2d 53 (1999).]

Nor can we short-circuit the political process and disregard the separation of powers by "revis[ing], amend[ing], deconstruct[ing], or ignor[ing]" the existing statutory received-by deadline[4] merely because the parties agree it should be so. This Court must determine *independently* the meaning of constitutional terms, and it is not bound by the interpretation of another branch of government—let alone by a stipulation of the parties who brought this case and controversy before us. *Council of Organizations & Others for Ed about Parochiaid v Governor of Michigan*, 216 Mich App 126, 131; 548 NW2d 909 (1996) (this Court is not bound by another branch's interpretation of constitutional provisions, but must determine independently the meaning of constitutional terms); *Mack v City of Detroit*, 467 Mich 186, 209; 649 NW2d 47 (2002) ("[N]o one can seriously question the right of this Court to set forth the law as clearly as it can, irrespective whether the parties assist the Court in fulfilling its constitutional function. The jurisprudence of Michigan cannot be, and is not, dependent upon whether individual parties accurately identify and elucidate controlling legal questions.").

The statutory received-by deadline is presumed constitutional, and the burden of proving otherwise rests with the party challenging the statute's constitutionality. *In re Request for Advisory Opinion*, 479 Mich at 11. At first glance, it is difficult to discern which party carries the burden in this case, as it seems that defendant concedes the issue and leaves it to this Court to select a new received-by deadline. However, it ultimately is plaintiffs' burden to show that the existing received-by deadline poses a severe infringement on the right to vote—and it is a burden that they have failed to meet. *Id.* at 36.

Plaintiffs recite a parade of horribles that may result from our refusal to grant mandamus relief. However, those outcomes are speculative, and as such, are insufficient to carry their burden. See *Purcell v Gonzalez*, 549 US 1, 6; 127 S Ct 5; 166 L Ed 2d 1 (2006) (STEVENS, J., concurring) (stating that it was prudent to allow an election to proceed without enjoining certain statutory provisions where factual issues remained unresolved because, given the importance of the constitutional issues, the matter should be resolved on the "basis of historical facts rather than speculation"). Moreover, this Court cannot, and this concurrence certainly does not, rest its decision on whether or not mandamus relief might impact the outcome of the upcoming presidential election. To do so would serve a number of evils and would be an abdication of our duty as an independent judiciary. Assuming we know the minds of the voters,[5] which is an impossibility, and disregarding the other important issues on the upcoming ballots in this state,

---

[4] *In re Complaint of Rovas Against SBC Michigan*, 482 Mich 90, 98; 754 NW2d 259 (2008).

[5] One would need to assume that absentee voters are predisposed to vote for one candidate or another. But see Thompson et al, *Universal vote-by-mail has no impact on partisan turnout or vote share*, 117 PNAS 25 (2020) (contrary to popular claims, empirical evidence indicates that voting-by-mail does not favor any party over another).

this Court cannot put its heavy thumb on the delicate scales of democracy. To do so would usurp the role of the Legislature, supplant the will of the electorate when it adopted Proposal 3 as written, and dilute the votes that comply with the constitutionally mandated received-by statute. *In re Request for Advisory Opinion*, 479 Mich at 43 (the right to vote enshrined in Art 2, § 4 includes the assurance that one's vote will not be diluted by votes cast illegitimately). Doing so also would place this Court above the co-equal branches of our state government, and would delegitimize the election on a national scale by debasing the legitimate votes cast in our sister states. *Reynolds*, 377 US at 555, (stating that "the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise").

This Court is not unaware, or unsympathetic to the very real and serious plight of voters during the ongoing COVID-19 pandemic. Voters cannot be expected to exercise their right to vote at their own peril—or to risk the health of their fellow community members in order to have their votes counted. However, the method of addressing these issues requires the exercise of discretion, the marshaling and allocation of resources, and the confrontation of thorny policy issues—tasks which are appropriately performed by the Legislature. The people of this state, in their right to self-governance, tasked the Legislature with the constitutional duty "to enact laws to regulate the time, place and manner of all nominations and elections, to preserve the purity of elections, to preserve the secrecy of the ballot, to guard against abuses of the elective franchise, and to provide for a system of voter registration *and absentee voting*." Art 2, § 4(2) (emphasis added). For this Court to appropriate that task would be an improper infringement, and would jeopardize the people's right to self-governance. We must leave the issue in the capable hands of the Legislature and the Executive which have the constitutional authority, resources, and access to the best practices throughout the country from which to craft solutions.[6] Therefore, I agree with the

---

[6] It appears the Legislature has already taken steps to address many issues surrounding the upcoming general election. In addition to 2020 HB 5807, discussed earlier, the Legislature is also considering 2020 SB 909 which proposes to eliminate in-person voting at precincts and convert elections entirely to mail-in voting, 2020 SB 756 which proposes to allow clerks additional shifts of workers to count absentee ballots, and SB 757 which proposes to permit clerks to preprocess absentee ballots ahead of Election Day.

In addition, the Legislature may look to the best practices of other states. Five states conduct elections entirely by mail. Oregon began doing so in 2000, Washington in 2005, Utah in 2013, Colorado in 2014, and Hawaii more recently in the 2020 primary. See Colo Rev Stat 1-5-401; Haw Rev Stat 11-101; Or Rev Stat 254.465; Utah Code 20A-3a; Wash Rev Code 29A 40-010. Washington D.C. plus 29 states, including Michigan, permit "no-excuse" absentee voting in federal elections; 16 states permit "excuse-only" absentee voting, and most states statutorily require absentee ballots to be received by Election Day. National Conference of State Legislatures (NCSL), *All-Mail Elections (aka Vote-By-Mail)*, <https://www.ncsl.org/research/elections-and-campaigns/all-mail-elections.aspx> (accessed July 6, 2020).

Notably, Colorado, which has a received-by deadline of 7 p.m. on election day, has been hailed as the model for voting by mail. To be counted, all envelopes containing absentee voter ballots must be in the hands of the designated election official or an election judge for the local

majority opinion that mandamus relief is not warranted. *McLeod v State Bd of Canvassers*, 304 Mich 120, 125; 7 NW2d 240 (1942) (mandamus should not issue where the party seeking it has an adequate remedy at law); *Citizens Protecting Michigan's Constitution v Secretary of State*, 280 Mich App 273, 284; 761 NW2d 210 (2008) (the party seeking a writ of mandamus must establish that it (1) has a clear legal right to performance of the specific duty sought, (2) the defendant has the clear legal duty to perform the act requested, (3) the act is ministerial, and (4) no other remedy exists that might achieve the same result).

## COUNT II

I agree with the majority opinion that mandamus relief is inappropriate regarding plaintiffs' allegation that, by their estimate, roughly one-third of all local clerks have failed to immediately process absentee-ballot applications within 40 days of an election in violation of MCL 168.761(1).

"Michigan's elections system is administered by 1,603 county and local election officials making it one of the most decentralized elections systems in the nation."[7] There is nothing in the record identifying which clerks this Court should direct defendant to instruct, and it is not our job to seek out that information or substantiate plaintiffs' allegations. That burden lies with plaintiffs, *In re Request for Advisory Opinion*, 479 Mich at 11, and it requires more specificity than a rough estimate of the number of possible offenders. See *Natl Bank of Detroit v State Land Office Bd*, 300 Mich 240, 250; 1 NW2d 525 (1942) ("Where none but specific relief will do justice, specific

---

government not later than 7 p.m. on election day. Colo Rev Stat 1- 7.5- 107(4)(b)(II); Leonhardt, *An Election Day Success*, New York Times (July 1, 2020) (discussing Colorado's model approach to voting by mail).

During the COVID-19 pandemic, most states are creating solutions to address the same issues raised by the parties in this lawsuit, and other democratic countries have conducted elections with mixed results. See e.g., Mays, *Vernon Town Meeting Goes Digital, Includes Drive-Up Vote*, NBC Connecticut News (March 25, 2020), available online at <https://www.nbcconnecticut.com/news/local/vernon-town-meeting-goes-digital-includes-drive-up-vote/2245233/> (discussing 55 votes cast by residents regarding town lease payments); The Economist, Why voting online is not the way to hold an election in a pandemic, <https://www.economist.com/international/2020/04/27/why-voting-online-is-not-the-way-to-hold-an-election-in-a-pandemic> (posted April 28, 2020) (accessed July 6, 2020); Amy Gunia, Time, *South Korea Is Voting in the Middle of Coronavirus. Here's What U.S. Could Learn About Its Efforts to Protect Voters*, Time, <https://time.com/5818931/south-korea-elections-coronavirus/> (posted April 13, 2020) (accessed July 6, 2020); Ishaan Tharoor, Washington Post, *Coronavirus Kills Its First Democracy*, (March 31, 2020). Additionally, the Legislature could choose to adopt the same received-by deadline that it employs for uniformed services and overseas voters. MCL 168.795a(16). See also the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA), 52 USC 203.

[7] Election Officials Manual, February 2019, Chapter 1, Structure of Michigan's Election System, p 1 <www.michigan.gov/documents/sos/I_Structure_of_MI_Elections_System_265982_7.pdf> (accessed July 6, 2020).

relief should be granted if practicable. And where a right is single and specific it usually is practicable."). Thus, mandamus relief is not appropriate here.

COUNT III

I agree with the majority opinion that prepaid return postage for absentee ballots is not required under our state constitution.[8] However, I do not find particularly persuasive defendant's argument that a voter's minimal burden of paying postage is outweighed by the state's important interest in its finances and that defendant suffers from reduced resources due to the economic downturn resulting from the pandemic. Defendant requested and received $12 million in federal funds for election administration under the Help America Vote Act (HAVA) plus $2.4 million in matching state funds and used some portion of that money to prepay postage for absentee ballots in the May 5, 2020 primary election.[9] Defendant also requested and received an additional $11.3 million under the Coronavirus Aid, Relief, and Economic Security (CARES) Act and $2.3 million in matching state funds for election administration costs associated with the pandemic.[10] I am unaware of any federal or state statute that prohibits defendant from allocating a portion of those funds for prepaid postage. Rather, defendant suggests that her failure to include the expense of prepaid return postage in her funding requests now precludes her from allocating money for this expenditure.[11]

---

[8] Although plaintiffs argue that MCL 168.761(1) compels local clerks to immediately process absentee ballot applications, see Count II, *supra*, this statute is not cited in their argument regarding prepaid postage even though it directs clerks to forward absentee ballots "by mail, postage prepaid," or by personal delivery under certain circumstances. Plaintiffs raise the issue of prepaid postage only as a constitutional challenge under Article 2, § 4, and thus, this Court considers only the constitutional dimension of this issue.

[9] See U.S. Election Assistance Commission, 2020 HAVA Funds, <https://www.eac.gov/payments-and-grants/2020-hava-funds> (accessed July 7, 2020); Executive Order No. 2020-27 (permitting the Secretary of State to "assist local clerks, county clerks, and election administrators with: the mailing of absent voter ballot applications with a postage-prepaid, pre-addressed return envelope to each registered voter within any jurisdiction conducting a May 5, 2020 election; the preparation of postage-prepaid absent voter ballot return envelopes;" and other measures); Secretary of State, *Secretary of State to mail absent voter ballot applications to all May 5 voters*, <https://www.michigan.gov/sos/0,4670,7-127-93094-522761--,00.html> (posted March 23, 2020) (accessed July 7, 2020).

[10] See U.S. Election Assistance Commission, 2020 CARES Act Grants FAQ <https://www.eac.gov/payments-and-grants/2020-cares-act-grants> (accessed July 7, 2020).

[11] The parties have not estimated the total cost for providing prepaid postage. However, it seems the United States Postal Service offers some reasonably affordable packages. See United States Postal Service, *Facilitating the Processing and Delivery of Return Ballots from Voters Using Prepaid Postage*, <https://about.usps.com/gov-services/election-mail/prepaid-reply-mail-info.htm> (accessed July 7, 2020). Additionally, a number of precincts already provide return postage for absentee ballots. See The Detroit News, *One of Michigan's largest cities makes*

Although I do find defendant's argument persuasive, I nonetheless agree with the majority's conclusion that requiring voters to supply their own stamps is not a severe restriction when there is no requirement that absentee voters mail their ballots. Instead the voter or an immediate family member may deliver the ballot in person or, if requested, the city or township clerk must pick up the ballot or send an election assistant to pick up the ballot. MCL 168.764a. In light of these options, I cannot conclude that plaintiff is entitled to mandamus relief on this issue.

Accordingly, I concur with the majority.

/s/ Michael J. Riordan

---

*absentee voting easier for November*, <https://www.detroitnews.com/story/news/politics/2020/06/28/sterling-heights-absentee-voting-easier/3263222001/> (posted June 28, 2020) (accessed July 7, 2020) (discussing Sterling Height's decision to provide prepaid postage and Detroit's longstanding policy of doing the same).