*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

MICHIGAN ALLIANCE FOR RETIRED AMERICANS, DETROIT/DOWNRIVER CHAPTER OF THE A. PHILIP RANDOLPH INSTITUTE, CHARLES ROBINSON, GERARD McMURRAN, and JIM PEDERSON,

      Plaintiffs-Appellees,

v

SECRETARY OF STATE and ATTORNEY GENERAL,

      Defendants,

and

SENATE and HOUSE OF REPRESENTATIVES,

      Intervening Defendants-Appellants,

and

REPUBLIC NATIONAL COMMITTEE and MICHIGAN REPUBLICAN PARTY,

      Proposed Intervening Defendants.

FOR PUBLICATION
October 16, 2020
9:00 a.m.

No. 354993
Court of Claims
LC No. 20-000108-MM

Before: CAMERON, P.J., and BOONSTRA, and GADOLA, JJ.

CAMERON, P.J.

Intervening defendants, the Senate and the House of Representatives (collectively, "the Legislature"), appeal by right a September 30, 2020 opinion and order of the Court of Claims, which granted declaratory and injunctive relief in favor of plaintiffs with respect to the receipt deadline for absentee ballots and ballot-handling restrictions that limit who may lawfully possess another voter's ballot. For the reasons stated in this opinion, we reverse.

# I. FACTS AND PROCEDURE

In June 2020, plaintiffs filed a complaint against defendant Secretary of State ("Secretary") and defendant Attorney General, seeking declaratory and injunctive relief related to the handling and counting of absent voter ballots for the 2020 general election.[1] Plaintiffs later filed an amended complaint, asserting facial and as-applied challenges to the constitutionality of three laws: (1) a deadline requiring that ballots submitted by absent voters must be received by election officials before polls close at 8:00 p.m. on election day in order to be counted; (2) a ballot-handling provision that restricts who, other than the voter, may possess, solicit, or deliver an absent voter's ballot; and (3) a requirement that voters who choose to submit their ballot by mail must first affix the necessary postage to their envelope to ensure delivery. In relevant part, plaintiffs alleged that these laws, in combination with the anticipated delay in the delivery of mail due to the COVID-19 pandemic, impose unconstitutional burdens on plaintiffs' right to vote absentee in violation of Const 1963 art 1, § 2. Plaintiffs urged the Court of Claims to declare these laws unconstitutional and suspend the enforcement of these election laws for the 2020 general election. Plaintiffs further asked the court to order that all absent voter ballots postmarked before election day and received within 14 days of election day must be counted, to suspend the ballot-handling restrictions, and to require that Michigan provide prepaid postage to all voters who requested an absentee ballot.

Plaintiffs later requested that the Court of Claims issue a preliminary injunction, and the Court of Claims did so in part. Thereafter, plaintiffs and defendants filed competing motions for summary disposition. Ultimately, the Court of Claims granted partial relief to plaintiffs, concluding that plaintiffs had established two as-applied constitutional violations of plaintiffs' right to vote absentee in the 2020 general election. The Court of Claims issued an order enjoining the operation of two election laws: the deadline for mail-in absent voter ballots and the restriction limiting who can lawfully possess, solicit, and deliver another person's ballots. The Court of Claims ordered that mail-in ballots received after the polls closed on election night would now be eligible to be counted up to 14 days later, provided that "the ballot is postmarked before election day" and received by the clerk within 14 days of the election.[2] The Court of Claims also suspended

---

[1] Plaintiffs' original complaint requested preliminary and permanent injunctive relief. The Court later entered the following scheduling order: "IT IS HEREBY ORDERED: that oral argument on Plaintiff's request for Declaratory and Injunctive relief is scheduled for Wednesday, July 08, 2020 at 11:00 a.m. via Zoom. Plaintiffs' brief shall be filed by Friday, June 26, 2020 at 12:00p.m. Defendants' response is due by Friday, July 03, 2020 at 12:00p.m. No replies are permitted." Thereafter, plaintiffs filed a brief entitled "BRIEF IN SUPPORT OF PLAINTIFFS' REQUEST FOR PRELIMINARY INJUNCTIVE RELIEF IN COMPLIANCE WITH THE COURT'S 6/19/20 SCHEDULING ORDER," in support of their demand for preliminary injunctive relief. In defendants' response, defendants noted that plaintiffs had not moved for a preliminary injunction before the trial court issued its scheduling order.

[2] The Court of Claims held in relevant part: "[c]onsistent with MCL 168.822, the timely postmarked ballot must be received by the clerk's office no later than 14 days after the election has occurred, so as not to interfere with the board of county canvassers' duty to certify election results by the fourteenth day after the election."

the ballot-handling restrictions regarding third parties possessing and delivering absentee ballots as long as the third party's conduct occurs from 5:01 p.m. on the Friday before the 2020 general election until polls close, so long as the absent voter gives his or her approval. The Court of Claims rejected plaintiffs' final claim that the State was constitutionally required to provide pre-paid postage for absent voters to use after completing their ballots and granted summary disposition in favor of defendants with respect to this claim only.

After defendants elected not to appeal, the Legislature, which had appeared as amicus in the Court of Claims proceedings, successfully intervened and filed the instant appeal. The Republican National Committee and the Michigan Republican Party appear on appeal as amici.[3]

## II. LEGAL BACKGROUND

Michigan law formerly required voters to designate one of six reasons to support a request to vote absentee. In November 2018, Michigan voters approved Proposal 3, which bestowed a constitutional right to "no-reason" absentee voting to all Michigan voters. Const 1963, art 2, § 4(1)(g) now provides that Michigan voters shall have the right "to vote an absent voter ballot without giving a reason . . . ." The Legislature then enacted 2018 PA 603, which amended the Michigan Election Law accordingly.

Under Michigan Election Law, registered voters may apply for an absentee ballot by completing an application to receive an absentee ballot. The application from an already-registered voter must be made before "4 p.m. on the day before the election." MCL 168.761(3). An unregistered voter, however, may apply for an absentee ballot as late as "before 8 p.m. on election day" provided that he or she does so in person at the clerk's office. MCL 168.761(3). Notably, if a voter applies for an absentee ballot after 5:00 p.m. on the Friday before an election, "[t]he clerk of a city or township shall not send by first-class mail an absent voter ballot . . . ." MCL 168.759(2). The Secretary has issued instructions to clerks to transmit a ballot to a voter by mail only where adequate time exists for the voter to receive the ballot by mail, vote, and return the ballot before 8:00 p.m. on election day.

By law, an absent voter ballot contains the following instructions to the voter: (1) read the voting instructions; (2) after voting, place the ballot in the secrecy sleeve or fold it to conceal the votes; (3) place the ballot in the return envelope and seal it; (4) sign and date the envelope and, if assistance in voting was required, mark that on the envelope; and (5) use one of four methods to deliver the return envelope to the clerk. MCL 168.764a.

Step Five in the above instructions provides four methods of delivering completed absent voter ballots to the clerk. First, voters may deposit ballots in "the United States mail or with another public postal service, express mail service, parcel post service, or common carrier." MCL 168.764a, Step 5(a). Voters who choose to use the United States mail or a delivery service must "[p]lace the necessary postage upon the return envelope . . . ." MCL 168.764a, Step 5(a). Second, a voter may deliver the completed absentee ballot in person. MCL 168.764a, Step 5(b). Third, a

---

[3] *Michigan Alliance for Retired Americans v Secretary of State*, unpublished order of the Court of Appeals, issued October 9, 2020 (Docket No. 354993).

voter may mail or deliver his or her ballot through "a member of the immediate family of the voter including a father-in-law, mother-in-law, brother-in-law, sister-in-law, son-in-law, daughter-in-law, grandparent, or grandchild or a person residing in the voter's household." MCL 168.764a, Step 5(c). But a person who is not a member of a voter's immediate family or who does not reside in the voter's household is prohibited from possessing another person's ballot; indeed, to do so subjects the person to prosecution for a 5-year felony. MCL 168.764a; MCL 168.761; MCL 168.932(f); MCL 168.935. The fourth and final method is that a voter, who is unable to return his or her absent voter ballot by any of the other authorized methods, may "request by telephone that the clerk who issued the ballot provide assistance in returning the ballot." MCL 168.764a, Step 5(d). When the proper request is made before "5 p.m. on the Friday immediately preceding the election," the clerk's office is required to pick up and deliver the absent voter ballot.[4] MCL 168.764a, Step 5(d). See also MCL 168.764b(4)(c). When the request occurs after 5:00 p.m. on the Friday immediately preceding the election, the clerk may—but is not duty bound—to pick up and deliver the absent voter ballot.[5]

Notably, if an absent voter's ballot is returned to the clerk's office in an unauthorized manner, the ballot will not be "invalidated solely because the delivery to the clerk was not in compliance" with the statutes. MCL 168.764b(7). Rather, the ballot will be processed as a challenged ballot. MCL 168.764b(7). Completed ballots must be received by the clerk "before the close of the polls on election day."[6] MCL 168.764a, Step 6. Furthermore, MCL 168.759b provides in relevant part that "[t]o be valid, ballots must be returned to the clerk in time to be delivered to the polls prior to 8 p.m. on election day." Ballots not received by 8:00 p.m. on election day are not counted. MCL 168.764a, Step 6 ("An absent voter ballot received by the clerk or assistant of the clerk after the close of the polls on election day will not be counted.").

---

[4] The pertinent sentence reads, "The clerk is required to provide assistance if you are unable to return your absent voter ballot as specified in (a), (b), or (c) above, if it is before 5 p.m. on the Friday immediately preceding the election, and if you are asking the clerk to pickup the absent voter ballot within the jurisdictional limits of the city, township, or village in which you are registered." Therefore, under the plain language of the statute, a voter need only call the clerk before 5 p.m. on the Friday immediately preceding the election to trigger the clerk's duty to provide ballot-delivery service for eligible absent voters.

[5] The clerk's obligations found in MCL 168.764b(4) and (5) are essentially same except that MCL 168.764b(4) reduces the clerk's responsibility to provide ballot-delivery services from a "shall" to "may" if the request for assistance is made after 5:00 p.m. on the Friday immediately preceding the election. Although not particularly relevant to this appeal, MCL 168.764(4) also removes the restriction that, during this narrow window, election officials may provide ballot-delivery services for absent voters even if the ballot is outside of the jurisdictional limits in which the absent voter is registered.

[6] The polls close at 8:00 p.m. MCL 168.720.

III.  ANALYSIS

A.  STANDING

Plaintiffs argue that the Legislature does not having standing to file an appeal in this matter. We disagree.

Whether a party has standing is a question of law subject to review de novo.  *Groves v Dept of Corr*, 295 Mich App 1, 4; 811 NW2d 563 (2011).  In *League of Women Voters of Mich v Secretary of State (League I)*, ___ Mich App ___, ___; ___ NW2d ___ (Docket Nos. 350938, 351073, issued January 27, 2020), slip op at 6, lv pending, this Court observed as follows:

> [T]his Court has jurisdiction over appeals by right "filed by an aggrieved party."  MCR 7.203.  *Black's Law Dictionary* (11th ed) defines "aggrieved party" as "a party entitled to a remedy; esp. a party whose personal, pecuniary, or property rights have been adversely affected by another person's actions or by a court's decree or judgment."  "To be aggrieved, one must have some interest of a pecuniary nature in the outcome of the case, and not a mere possibility arising from some unknown and future contingency."  *Federated Ins Co v Oakland Co Rd Comm'n*, 475 Mich 286, 291; 715 NW2d 846 (2006).

> * * *

> " 'Standing is the legal term used to denote the existence of a party's interest in the outcome of the litigation; an interest that will assure sincere and vigorous advocacy.' "  *Allstate Ins Co v Hayes*, 442 Mich 56, 68; 499 NW2d 743 (1993) (citations omitted).

Furthermore, our Supreme Court has ruled in pertinent part that "a litigant on appeal must demonstrate an injury arising from either the actions of the trial court or the appellate court judgment rather than an injury arising from the underlying facts of the case."  *Federated Ins Co*, 475 Mich at 291-292.  Therefore, the appellate litigant also must show a "concrete and particularized injury."  *Id*.

Here, plaintiffs argue that the Legislature has not met its heavy burden of establishing that it has standing on appeal.  In so arguing, however, plaintiffs overlook the Legislature's interests given that the Legislature is "an entity that certainly has an interest in defending its own work." *League II*, ___ Mich ___, ___; 948 NW2d 70 (Docket No. 161671, issued September 11, 2020), slip op at 7 n 4 (MCCORMACK, C.J., dissenting).  This is particularly the case here given that the Legislature is defending the constitutionality of several of its statutes, as well as the manner in which future elections are to be conducted in this State.  The Legislature—which is a body that is subject to these election procedures and as elected officials of the citizens of this State— undoubtedly has a significant interest in the instant appeal.  Indeed, it is difficult to envision interests that would assure more sincere and vigorous advocacy.

Although plaintiffs oppose the Legislature's standing on the basis of *League I*, we conclude that case is distinguishable.  The Legislature in *League I* sought to pursue—as a plaintiff—a declaratory judgment to enforce particular legislation; in doing so, the Legislature was "plainly

challenging the actions of members of the Executive Branch." *League I*, ___ Mich App at ___; slip op at 4, 8. In this case, however, the Legislature sought to intervene after defendants, constitutional officers within the Executive Branch, declined to appeal the Court of Claims's decision. The Legislature, as elected representatives of the citizens of Michigan, is essentially taking the place of defendants in this case to ensure an actual controversy with robust contrary arguments. Indeed, the Court of Claims initially denied the Legislature's motion to intervene and only permitted intervention after the Executive Branch abdicated its role in this litigation. As noted by this Court in *League of Women Voters of Mich v Secretary of State (League II)*, ___ Mich App ___, ___; ___ NW2d ___ (issued July 14, 2020, Docket No. 353654), slip op at 5,

> just as a legislative body cannot legitimately enact a statute that is repugnant to the Constitution, nor can an executive branch official effectively declare a properly enacted law to be void by simply conceding the point in litigation. To vest such power in an official, it would effectively grant such official the power to amend the Constitution itself.

For these reasons, we conclude that the Legislature has standing to appeal in this matter.

Amici also challenge plaintiffs' standing to bring suit, arguing that plaintiffs have not shown a special injury. However, plaintiffs in this action include the Michigan Alliance for Retired Persons ("MARP"), which is a nonprofit corporation with over 200,000 members, many of whom are elderly and/or disabled, and the Detroit/Downriver Chapter of the A. Philip Randolph Institute, the senior constituency group of the AFL-CIO. The individual plaintiffs, Charles Robinson, Gerard McMurran, and Jim Pederson, are all members of MARP, are over the age of 61, and are retired union members. Given the exigent circumstances here and given that plaintiffs have asserted their members' status as elderly or disabled individuals—some of whom have underlying health conditions that make them more vulnerable to COVID-19—we assume without deciding that plaintiffs have standing. See *House of Representatives v Governor*, ___ Mich App ___, ___; ___ NW2d ___ (Docket No. 353655, issued August 21, 2020), slip op at 9 ("In light of this highly expedited appeal, we shall proceed on the assumption that the Legislature had standing to file suit against the Governor for declaratory relief."), rev'd on other grounds by *House of Representatives v Governor*, ___ Mich ___ (Docket No. 161917, entered October 12, 2020).

## B. DECLARATORY RELIEF

The Legislature argues that the Court of Claims erred by granting summary disposition in favor of plaintiffs on its declaratory action. We agree.

This Court reviews de novo a trial court's decision on a motion for summary disposition in an action seeking declaratory relief. *League I*, ___ Mich App at ___; slip op at 6. The constitutionality of a statute presents a question of law to which this Court applies a de novo standard of review. *GMAC LLC v Treasury Dep't*, 286 Mich App 365, 372; 781 NW2d 310 (2009).

The Legislature first argues that the Court of Claims should have analyzed plaintiffs' declaratory claims as a facial attack on the election laws because plaintiffs' allegations do not amount to an as-applied challenge. An "as-applied" challenge "considers the specific application

of a facially valid law to individual facts," while a "facial" constitutional challenge considers the plain language of the challenged provision (i.e., on its face). *In re Request for Advisory Opinion Regarding Constitutionality of 2005 PA 71*, 479 Mich 1, 11; 740 NW2d 444 (2007) (citation omitted). In other words, a facial challenge is a claim that the law is "invalid *in toto*—and therefore incapable of any valid application . . . ." *Steffel v Thompson*, 415 US 452, 474; 94 S Ct 1209; 39 L Ed 2d 505 (1974). In contrast, "[a]n as-applied challenge, to be distinguished from a facial challenge, alleges a present infringement or denial of a specific right or of a particular injury in process of actual execution of government action." *Bonner v City of Brighton*, 495 Mich 209, 223 n 27; 848 NW2d 380 (2014) (internal quotation marks and citation omitted).

Frequently, as here, litigants describe their challenges as both facial and as-applied challenges. This is unsurprising given that elements of the two can overlap. See *Citizens United v Federal Election Comm*, 558 US 310, 331; 130 S Ct 876, 893; 175 L Ed 2d 753 (2010) (stating that "the distinction between facial and as-applied challenges is not so well defined . . . ."). However, as a general rule, substance prevails over the particular wording used in a complaint. *Auto Club Group Ins Co v Burchell*, 249 Mich App 468, 481; 642 NW2d 406 (2002). Thus, a litigant's labels are not what matter.

In *John Doe No 1 v Reed*, 561 US 186, 194; 130 S Ct 2811, 2817; 177 L Ed 2d 493 (2010), the Supreme Court examined whether a claim was a facial challenge or an as-applied challenge. In analyzing the issue, the *Reed* Court examined the substance of the plaintiffs' claim, which contained elements of a facial challenge because it was not limited to the plaintiffs' specific case, but also reflected an as-applied challenge because it did not seek to strike the challenged statute in its entirety. *Id.* The *Reed* Court then examined the plaintiffs' requested relief: an injunction barring the Secretary of State "from making referendum petitions available to the public." *Id.* The *Reed* Court declared that the label attached to the claim was not dispositive; rather, the Court held that the deciding factor was that the relief sought by the plaintiffs would "reach beyond the particular circumstances of these plaintiffs." *Id.* The *Reed* Court ruled that the plaintiffs must "satisfy our standards for a facial challenge to the extent of that reach." *Id.* (citing *United States v Stevens*, 559 US 460, 472-473; 130 S Ct 1577, 1587; 176 L Ed 2d 435 (2010)).

On casual inspection, plaintiffs' allegations appear to be as-applied challenges because they reference plaintiffs' particular vulnerability given the facts—COVID-19 and an alleged mail slowdown—as infringements on their right to vote only in the November 2020 general election. A reading of plaintiffs' request for relief, however, brings into focus the breadth of their requests, which are not confined only to plaintiffs. Specifically, the relief sought by plaintiffs would apply to *all* Michigan voters who choose to cast their ballots by mail—not just to the elderly and disabled members of plaintiffs' organizations. Therefore, the ballot deadline relief extends well beyond the circumstances of the individual plaintiffs and their organizations and would reach all Michigan voters who, for whatever reason, would benefit from more time in which to mail their ballot. Furthermore, lifting the restrictions and criminal penalties concerning who may handle absent voter ballots would apply to all Michigan voters as long as the conduct in question occurs after 5:00 p.m. on the Friday before the election. While plaintiffs' challenge arises only in relation to a specific fact-pattern—the November 3, 2020 election during the COVID-19 pandemic and slow mail delivery—the relief plaintiffs seek applies to every Michigan absent voter. Therefore, the

substance of plaintiffs' amended complaint is a facial challenge of the relevant statutes, and the Court of Claims erred by failing to analyze the claims accordingly.[7]

That said, we must next consider whether plaintiffs were entitled to summary disposition on their declaratory action. As already stated, plaintiffs alleged that the ballot receipt deadline required by MCL 168.759b and MCL 168.764a and the ballot-handling restrictions required by MCL 168.932(f) violate Const 1963, art 2, § 4(1)(g), which guarantees voters the right to vote by absentee ballot without giving a reason "during the forty (40) days before an election" and the right "to choose whether the absent voter ballot is applied for, received and submitted in person or by mail." Importantly, because Const 1963, art 2, § 4 is a self-executing constitutional provision, the legislature is not permitted to impose additional undue obligations. *Durant v Dep't of Ed*, 186 Mich App 83, 98; 463 NW2d 461 (1990).

The guiding framework for an examination of the constitutionality of a statute begins with the presumption that statutes are constitutional, and "courts have a duty to construe a statute as constitutional unless its unconstitutionality is clearly apparent." *Taylor v Smithkline Beecham Corp*, 468 Mich 1, 6; 658 NW2d 127 (2003). "A party challenging the facial constitutionality of a statute faces an extremely rigorous standard, and must show that no set of circumstances exists under which the act would be valid." *In re Request for Advisory Opinion*, 479 Mich at 11 (quotation marks, citation, brackets, and footnotes omitted).

With regard to plaintiffs' arguments concerning the ballot-receipt deadline, we need not analyze this point. In this Court's divided opinion in *League II*, this Court held that the 8:00 p.m. ballot-receipt deadline survives a facial challenge and does not violate Const 1963, art 2, § 4. *League II*, ___ Mich App at ___; slip op at 14-16. We are not only bound by that holding, but we fully agree with it. MCR 7.215(J)(1).

Although this Court in *League II* did not address the statutory provisions that provide ballot-handling restrictions, we conclude that MCL 168.932(f) also survives a facial challenge. As noted in *League II*,

> In [*In re Request for Advisory Opinion*, 479 Mich at 35] . . . , our Supreme Court held that "the Michigan Constitution does not compel that every election regulation be reviewed under strict scrutiny." The Court recognized that in *Burdick*

---

[7] We reject plaintiffs' argument that the fact that the changes would apply only to the November 2020 election removes this case from a facial analysis. Because the relief would extend to all Michigan absent voters—not just plaintiffs—in the November 2020 election, it does not survive the *Reed* analysis. Plaintiffs also contend that, even if the relief extends beyond their circumstances, reversal still is not required because courts often invalidate laws facially on the basis of their impact on certain communities and subgroups. For example, plaintiffs cite *Crawford v Marion Cty Election Bd,* 553 US 181; 128 S Ct 1610; 170 L Ed 2d 574 (2008), where the Court considered a law's impact on identifiable subgroups for whom the burden may be most severe. For the reasons already explained, however, we conclude that the relief plaintiffs seek is not tailored to a subgroup or subgroups. Instead, the relief plaintiffs seek would apply to all absent voters.

*v Takushi*, 504 US 428; 112 S Ct 2059; 119 L Ed 2d 245 (1992), the United States Supreme Court "rejected the notion that every election law must be evaluated under strict scrutiny analysis." *Id*. at 20-21. The Court stated that the *Burdick* Court "recognized that 'to subject every voting regulation to strict scrutiny and to require that the regulation be narrowly tailored to advance a compelling state interest . . . would tie the hands of States seeking to assure that elections are operated equitably and efficiently.' " *Id*. at 21, quoting *Burdick*, 504 US at 433. [*League II*, ___ Mich App at ___; slip op at 14.]

Indeed, although "the right to vote is an implicit fundamental political right that is preservative of all rights," that right is not absolute. *Promote the Vote v Secretary of State*, ___ Mich App ___, ___; ___ NW2d ___ (Docket No. 353977, issued July 20, 2020) (quotation marks and citations omitted), slip op at 13. "[S]tates have a compelling interest in preserving the integrity of their election processes[.]" *In re Request for Advisory Opinion*, 479 Mich at 19. "In order to protect that compelling interest, a state may enact generally applicable and evenhanded restrictions that protect the integrity and reliability of the electoral process[.]" *Id*. at 19-20 (quotation marks and citation omitted). Our Supreme Court has described the *Burdick* test as balancing between protecting the citizens' right to vote and protecting against fraudulent voting. *Id*. at 35. It has commented as follows regarding application of the *Burdick* test:

> [T]he first step in determining whether an election law contravenes the constitution is to determine the nature and magnitude of the claimed restriction inflicted by the election law on the right to vote, weighed against the precise interest identified by the state. If the burden on the right to vote is severe, then the regulation must be "narrowly drawn" to further a compelling state interest. However, if the restriction imposed is reasonable and nondiscriminatory, then the law is upheld as warranted by the important regulatory interest identified by the state. The United States Supreme Court has stressed that each inquiry is fact and circumstance specific, because "[n]o bright line separates permissible election-related regulation from unconstitutional infringements[.]" [*In re Request for Advisory Opinion,* 479 Mich at 21-22 (citation omitted)].

In this case, the Legislature argues that the ballot-handling restrictions are intended to combat voter fraud. "There is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters . . . . While the most effective method of preventing election fraud may well be debatable, the propriety of doing so is perfectly clear." *Crawford v Marion Cty Election Bd,* 553 US 181, 196; 128 S Ct 1610, 1619; 170 L Ed 2d 574 (2008).

Indeed, designing adjustments to our election integrity laws is the responsibility of our elected policy makers, not the judiciary. See Const 1963, art 2, § 4(2) ("[T]he legislature shall enact laws to regulate the time, place and manner of all . . . elections, to preserve the purity of elections, to preserve the secrecy of the ballot, to guard against abuses of the elective franchise, and to provide for a system of voter registration and absentee voting."). To be sure, the pandemic has caused considerable change in our lives, but election officials have taken considerable steps to alleviate the potential effects by making no-reason absent voting easier for the 2020 election. For instance, after Proposal 3, municipalities across Michigan now have installed more than 700 ballot drop boxes available for absent voters who do not want to use the mail to deliver their ballot, and

the Secretary has reported that there will be more than 1,000 drop boxes available by election day.[8] Additionally, satellite election centers embedded in some communities allow eligible persons to register to vote, receive a ballot, vote, and drop-off their completed ballot all on-site.[9] Our legislature has addressed the expected increase of absent-voter ballots by empowering clerks to begin processing absent-voter ballots earlier in an effort to provide a final vote tally after polls close for the 2020 election. MCL 168.765a(8). While plaintiffs may view these efforts as inadequate first steps, there is no reason to believe that these specific efforts are constitutionally required, even in the midst of a pandemic. Instead, they reflect the proper "exercise of discretion, the marshaling and allocation of resources, and the confrontation of thorny policy issues," that the people have reserved exclusively for our Legislative and Executive branches to exercise. *League II*, ___ Mich App at ___; slip op at 5 (RIORDAN, J., concurring). Imposing limits on whether third parties can possess or collect ballots simply reflects a policy decision by a duly elected legislature, where the Constitution places responsibility to regulate and preserve the purity of elections.

Although record evidence before the Court of Claims supported that voter fraud is very rare, our Supreme Court has ruled that "there is no requirement that the Legislature 'prove' that significant in-person voter fraud exists before it may permissibly act to prevent it." *In re Request for Advisory Opinion,* 479 Mich at 26. Even so, the Secretary acknowledges in its brief on appeal that voter fraud has occurred in the past in relation to voter assistance and that "[t]he challenged statutes . . . were amended in 1995 because investigations by election officials revealed abuse of that process." Indeed, until 1995, the statutes permitted any registered voter to return another voter's completed absentee ballot, but that "led to abuse by campaign workers who were eager to 'assist' absentee voters." *People v Pinkney,* unpublished per curiam opinion of the Court of Appeals, issued July 14, 2009 (Docket Nos. 282144; 286992), unpub op at 15 (citing House Legislative Analysis, HB 4242, October 17, 1995). In sum, we conclude that MCL 168.932(f)'s restrictions are reasonable and nondiscriminatory and that the restrictions are warranted to further an important regulatory interest: protecting against voter fraud.

However, the State's interest in protecting against voter fraud must be balanced against the voter's interest in the right to vote. The Court of Claims concluded that because the clerk's office was not *required* to pick up and deliver ballots after 5:00 p.m. on the Friday immediately preceding the election, there was an unacceptable risk that during this brief time before the election that some home-bound absent voters would be disenfranchised by a voter fraud provision that limits who the voters may entrust to possess and deliver their ballots. Thus, the question before this Court is whether the requirement that clerks provide voter assistance only until 5:00 p.m. on the Friday before an election, in addition to the COVID-19 pandemic and the asserted delivery slowdown at the United States Postal Service ("USPS"), imposes an unconstitutional burden on the right to vote

---

[8] Bridge Michigan, *Absentee ballot drop boxes boom in Michigan, despite controversy elsewhere*, October 5, 2020 <https://www.bridgemi.com/michigan-government/absentee-ballot-drop-boxes-boom-michigan-despite-controversy-elsewhere?amp > (accessed October 15, 2020).

[9] Warikoo, Niraj, *Detroit prepares for historic election with early voting options*, October 9, 2020 <https://www.freep.com/story/news/local/michigan/detroit/2020/10/09/city-early-voting-satellite-centers-drop-off-boxes/3597687001/ > (accessed October 15, 2020).

absentee. We conclude that it does not. First, even with the 5:00 p.m. limit, voters are not deprived of the choice to vote absentee; they retain all the options of delivering their ballot in person to the clerk, using one of over 1,000 drop boxes in the state, using community satellite voter centers, if available, or relying on any family member or household resident to do so.[10] Additionally, as pointed out by defendants, the clerk is required to assist voters with returning their ballots if the voters request such assistance before 5:00 p.m. on the Friday before an election, and may continue to provide door-to-door delivery service for qualified absent voters after that time. See MCL 168.764b(5) (providing that, under certain circumstances, the clerk may make arrangements to collect a ballot from a voter personally or by an authorized assistant). In furtherance of this effort, a clerk may appoint assistants to accept delivery of absentee ballots at any location within the city or township. MCL 168.764b(3).[11] That option, which has not been suspended during the pandemic, further mitigates the burden on voters who need assistance. Amici additionally point out that local clerks may provide "curbside voting," where registered voters can vote in their cars at the polling place on election day. Given those varied options, we cannot conclude that the ballot-handling restrictions impermissibly burden the right to vote absentee. On balance, the ballot-handling restrictions pass constitutional muster given the State's strong interest in preventing fraud.

Furthermore, even if plaintiffs' claims could be considered an as-applied challenge, those claims do not survive. In light of the COVID-19 pandemic, the Court of Claims concluded that returning the ballot by mail is the "only realistic option" for those with underlying health conditions who wish to vote absentee. That finding is unsupported given additional ballot delivery options available to absentee voters. Additionally, as pointed out by amici, the pandemic and resulting USPS mail delivery slowdowns are not attributable to the State. Although those factors may complicate plaintiffs' voting process, they do not automatically amount to a loss of the right to vote absentee. The letter from USPS General Counsel Thomas J. Marshall, which indicated that the law creates an "incongruity" and a "mismatch" between mail delivery standards and deadlines for casting mail-in ballots in Michigan, is not dispositive. The cited incongruity is not dependent on the COVID-19 pandemic or the USPS slowdown; Marshall's conclusion was on the basis of the USPS ideal delivery rates rather than those experienced during COVID-19. The fact that the Legislature drafted the statutes without accounting for USPS deadlines does not mean the statutes are unconstitutional as applied. Where plaintiffs retain other options for delivering their completed ballots, they have not lost their constitutional right to vote absentee.

---

[10] In view of those other options, voters are not compelled to deliver their ballot in person, which likely would be found unconstitutional as a severe burden. See generally *Deleeuw v State Bd of Canvassers*, 263 Mich App 497, 502 n 1; 688 NW2d 847 (2004) (noting that to require a candidate for a federal position in public office to file her petition in person would be violative of the United States Constitution).

[11] That section provides in relevant part: "The clerk of a city or township may appoint the number of assistants necessary to accept delivery of absent voter ballots at any location in the city or township. An appointment as assistant to accept delivery of absent voter ballots must be for 1 election only. An assistant appointed to receive ballots at a location other than the office of the clerk must be furnished credentials of authority by the clerk . . . . "

## C. INJUNCTIVE RELIEF

The Legislature next challenges the Court of Claims's entry of the preliminary and permanent injunctions. This Court reviews for an abuse of discretion a trial court's decision to grant injunctive relief. *Taylor v Currie*, 277 Mich App 85, 93; 743 NW2d 571 (2007); *Schadewald v Brule*, 225 Mich App 26, 39, 570 NW2d 788 (1997). "A court abuses its discretion when a decision falls outside the range of reasonable and principled outcomes." *House of Representatives*, ___ Mich App at ___; slip op at 20.

The Legislature first argues that the Court of Claims's "preliminary injunction analysis was deeply flawed" and that this Court should reverse the September 18, 2020 opinion and order. However, we conclude that this argument is moot. "The objective of a preliminary injunction is to maintain the status quo pending a final hearing regarding the parties' rights." *Alliance for the Mentally Ill of Mich v Dep't of Community Health*, 231 Mich App 647, 655-656; 588 NW2d 133 (1998). In this case, the Court of Claims granted plaintiffs' request for a preliminary injunction in its September 18, 2020 opinion and order. Thereafter, on September 30, 2020, the Court of Claims granted a permanent injunction. Because a permanent injunction was entered after the Court of Claims held "a final hearing regarding the parties' rights," the Legislature's challenge to the preliminary injunction is moot and need not be addressed. See *id*. Nonetheless, we have briefly considered the argument and conclude that the Court of Claims abused its discretion by entering the preliminary injunction given plaintiffs' failure to establish a likelihood of success on the merits and plaintiffs' failure to establish irreparable harm. See *Michigan AFSCME Council 25 v Woodhaven-Brownstown School District (On Remand)*, 293 Mich App 143, 148; 809 NW2d 444 (2011) (citation omitted).

The Legislature also challenges the Court of Claims's entry of the permanent injunction. In the September 30, 2020 opinion and order, the Court of Claims concluded that it was proper to grant a permanent injunction. In doing so, the Court of Claims addressed some of the factors required to be considered before a permanent injunction can be entered and "incorporated its reasoning from the September 18, 2020 opinion and order that . . . the ballot receipt deadline and the voter assistance ban violate art 2, § 4." The Court of Claims further incorporated into its September 30, 2020 "opinion and order the narrow injunctive relief granted in the Court's September 18, 2020 opinion and order." "It is beyond reasonable dispute that a trial court has the authority, and, in appropriate cases, the duty, to enter permanent injunctive relief against a constitutional violation." *Michigan Coalition of State Employee Unions v Michigan Civil Serv Comm*, 465 Mich 212, 219; 634 NW2d 692 (2001) (emphasis omitted). Because the Court of Claims erred by concluding that a constitutional violation existed, it necessarily follows that the Court of Claims abused its discretion by entering the permanent injunction.

We reverse and remand for the immediate entry of summary disposition in favor of defendants. This opinion has immediate effect. MCR 7.215(F). We do not retain jurisdiction.

/s/ Thomas C. Cameron
/s/ Mark T. Boonstra
/s/ Michael F. Gadola

-12-